# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA      :    **CRIMINAL COMPLAINT**

    v.                              :

HHCH HEALTH CARE, INC.,       :    Mag. No.: 13-8004 (MCA)
PEOPLE CHOICE HOME CARE, INC.,
IRINA KRUTOYARSKY,
   a/k/a "Irene,"
PAUL MIL,
NEKADAM S. GALIBOVA,
   a/k/a "Nina,"
LILIA BERSTEIN,
   a/k/a "Lilia Berensheyn,"
BELLA FRIDMAN,
MALVINA FROLOVA,
SONIA MESA,
NELSON MESA,
ALLA NEYMET,
LEONORA POPESKU, and
GULMIRA SHAYAKHMETOVA

     I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief.

## SEE ATTACHMENT A

     I further state that I am a Special Agent, and that this complaint is based on the following facts:

## SEE ATTACHMENT B

continued on the attached page and made a part hereof.

Joshua M. Liberman
Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,
on February 5, 2013, at Newark, New Jersey

HONORABLE MADELINE COX ARLEO
UNITED STATES MAGISTRATE JUDGE     Signature of Judicial Officer

ATTACHMENT A

## Count One
### (Conspiracy to Commit Health Care Fraud)

From in or around early 2008 through on or about February 5, 2013, in Union County, in the District of New Jersey and elsewhere, defendants

HHCH HEALTH CARE, INC.
PEOPLE CHOICE HOME CARE, INC.
IRINA KRUTOYARSKY,
a/k/a "Irene,"
PAUL MIL,
NEKADAM S. GALIBOVA,
a/k/a "Nina,"
LILIA BERSTEIN,
a/k/a "Lilia Berensheyn,"
BELLA FRIDMAN,
MALVINA FROLOVA,
SONIA MESA,
NELSON MESA,
ALLA NEYMET, and
LEONORA POPESKU

knowingly and intentionally conspired and agreed with each other and others to execute a scheme and artifice to defraud the New Jersey Medical Assistance Program, a health care benefits program as defined under Title 18, United States Code, Section 24(b), and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, contrary to Title 18, United States Code, Section 1347, in violation of Title 18, United States Code, Section 1349.

## Count Two
**(Bribery of a New Jersey Department of Labor Employee)**

On or about June 14, 2010, in Union County, in the District on New Jersey and elsewhere, defendants

HHCH HEALTH CARE, INC. and
IRINA KRUTOYARSKY,
a/k/a "Irene"

corruptly gave, offered, and agreed to give anything of value to a person, namely, an agent of the New Jersey Department of Labor, an entity of New Jersey State government that received federal assistance in excess of $10,000 in a one-year period, with the intent to influence and reward said agent, in connection with any business, transaction, and series of transactions of said organization, government, and agency involving anything of value of $5,000 or more, in violation of Title 18, United States Code, Section 666 and Section 2.

## Count Three
**(Bribery of a New Jersey Department of Labor Employee)**

On or about April 14, 2011, in Union County, in the District on New Jersey and elsewhere, defendants

HHCH HEALTH CARE, INC. and
IRINA KRUTOYARSKY,
a/k/a "Irene"

corruptly gave, offered, and agreed to give anything of value to a person, namely, an agent of the New Jersey Department of Labor, an entity of New Jersey State government that received federal assistance in excess of $10,000 in a one-year period, with the intent to influence and reward said agent, in connection with any business, transaction, and series of transactions of said organization, government, and agency involving anything of value of $5,000 or more, in violation of Title 18, United States Code, Section 666 and Section 2.

3

## Count Four
### (Conspiracy to Commit Money Laundering)

From in or around 2006 through on or about February 5, 2013, in Union County, in the District of New Jersey and elsewhere, defendants

IRINA KRUTOYARSKY,
a/k/a "Irene," and
PAUL MIL

knowingly and intentionally conspired and agreed with each other and others to conduct financial transactions affecting interstate commerce, as set forth in Attachment B below, which financial transactions involved the proceeds of specified unlawful activity, namely, health care fraud in violation of Title 18, United States Code, Section 1347, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity (a) with the intent to promote the carrying on of such specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(1)(A)(i); and (b) knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of the specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(1)(B)(i), in violation of Title 18, United States Code, Section 1956(h).

## Count Five
### (Conspiracy to Unlawfully Structure Financial Transactions)

From in or around late 2009 through in or around May 2011, in Union County, in the District of New Jersey and elsewhere, defendants

IRINA KRUTOYARSKY,
a/k/a "Irene," and
GULMIRA SHAYAKHMETOVA

knowingly and intentionally conspired and agreed with each other and others to commit an offense against the United States, that is, structuring transactions with a domestic financial institution by withdrawing United States currency into accounts at financial institutions in amounts less than $10,000 for the purpose of evading the reporting requirements of Title 31, United States Code, Section 5313(a) and the regulations issued thereunder, contrary to Title 31, United States Code, Sections 5324(a)(3) and 5324(d)(1).

In furtherance of the conspiracy and to effect its unlawful objects, the above-listed defendants and their co-conspirators committed and caused to be committed the overt acts, among others, in the District of New Jersey and elsewhere, as set forth in Paragraphs 73 through 81 below of Attachment B below.

In violation of Title 18, United States Code, Section 371.

ATTACHMENT B

I, Joshua M. Liberman, am a Special Agent with the Federal
Bureau of Investigation.  I have knowledge of the facts set forth
herein through my personal participation in this investigation
and through oral and written reports from other federal agents or
other law enforcement officers.  Where statements of others are
set forth herein, including statements that were intercepted or
consensually recorded, these statements are related in substance
and in part.  Furthermore, in certain instances, consensually
recorded conversations and meetings occurred in the Russian
language, and Your Affiant has reviewed and relied on the
translations of these conversations.  Since this Criminal
Complaint is being submitted for a limited purpose, I have not
set forth every fact that I know or other law enforcement
officers know concerning this investigation.  I have only set
forth those facts that I believe are sufficient to show probable
cause exists to believe that the defendants have committed the
offenses set forth in Attachment A.  Where I assert that an event
took place on a particular date, I am asserting that it took
place on or about the date alleged.

## The Defendants and Other Parties

1.  At all times relevant to this Criminal Complaint, unless
otherwise stated:

    a.  Defendant HHCH Health Care, Inc. was located in
Linden, New Jersey (hereinafter "HHCH").  HHCH was a for-profit
"home health agency" engaged in the business of providing home
health aides and care services to New Jersey residents.  In some
instances, such home health aide services were subsidized under
the New Jersey Medical Assistance Program (hereinafter
"Medicaid")(see Paragraph 2 below for an explanation of
Medicaid).  HHCH also provided home health aide services to
individuals who paid privately for these services.  HHCH
maintained several business accounts at a financial institution
located in New Jersey, including an operating account
(hereinafter the "HHCH Operating Account"), a payroll account
(hereinafter the "HHCH Payroll Account"), and a money market
account (hereinafter the "HHCH Money Market Account").
Defendants Irina Krutoyarsky and Paul Mil, see below, were each
signatories on these three HHCH business accounts.

    b.  Defendant People Choice Home Care, Inc. was
located in Elizabeth, New Jersey (hereinafter "People Choice").
People Choice was a for-profit "home health agency" engaged in
the business of providing home health aides and care services to

1

New Jersey residents.  In some instances, such home health aide services were subsidized by Medicaid.  People Choice also provided home health aide services to individuals who paid privately for these services.  People Choice maintained several business accounts at a financial institution located in New Jersey , including an operating account (hereinafter the "People Choice Operating Account"), a payroll account (hereinafter the "People Choice Payroll Account"), and a money market account (hereinafter the "People Choice Money Market Account").  Defendants Paul Mil and Irina Krutoyarsky (see below) were each signatories on these three People Choice business accounts.

        c.    Defendant Irina Krutoyarsky was a resident of Springfield, New Jersey and the principal owner and operator of HHCH.

        d.    Defendant Paul Mil was a resident of Springfield, New Jersey and the principal owner and operator of People Choice. Defendant Paul Mil was also the registered agent of HHCH.

        e.    Defendant Nekadam S. Galibova was a resident of Union, New Jersey and an office employee of HHCH.

        f.    Defendant Lilia Berstein was a resident of Old Bridge, New Jersey and employed, at various times, by HHCH and People Choice as a home health aide.

        g.    Defendant Bella Fridman was a resident of East Brunswick, New Jersey and employed, at various times, by HHCH and People Choice as a home health aide.

        h.    Defendant Malvina Frolova was a resident of Old Bridge, New Jersey and employed by HHCH as a home health aide.

        i.    Defendant Sonia Mesa, a resident of Elizabeth, New Jersey, was illegally residing in the United States. Defendant Sonia Mesa was employed, at various times, by HHCH and People Choice as a home health aide who was paid "off the books"; however, she neither had a valid social security number nor was certified by the State of New Jersey to work as a home health aide.  Defendant Sonia Mesa maintained a bank account at a financial institution located in New Jersey (hereinafter "Sonia Mesa Account").

        j.    Defendant Nelson Mesa, the spouse of defendant Sonia Mesa, was a resident of Elizabeth, New Jersey.  Defendant Nelson Mesa was a Medicaid recipient and a patient of HHCH who

purportedly received home health aide services on a daily basis through HHCH.

        k.    Defendant Alla Neymet was a resident of Edison, New Jersey and employed, at various times, by HHCH and People Choice as a home health aide.

        l.    Defendant Leonora Popesku was a resident of Edison, New Jersey and employed, at various times, by HHCH and People Choice as a home health aide.

        m.    Defendant Gulmira Shayakhmetova was a resident of Howell, New Jersey and employed by HHCH as a home health aide.

        n.    An individual was cooperating with law enforcement and employed by HHCH (hereinafter "Cooperating Witness One").

        o.    An individual was cooperating with law enforcement and employed by the State of New Jersey (hereinafter "Cooperating Witness Two"). Cooperating Witness Two was an employee of the State of New Jersey and assigned to a state agency that received federal assistance in excess of $10,000 in a one-year period.

        p.    An individual was cooperating with law enforcement (hereinafter "Cooperating Witness Three").

        q.    An individual was cooperating with law enforcement (hereinafter "Cooperating Witness Four").

        r.    An individual was a federal agent acting in an undercover capacity (hereinafter "Undercover Agent One").

        s.    An individual was a federal agent acting in an undercover capacity (hereinafter "Undercover Agent Two").

**Overview of Medicaid**

    2.    At various times relevant to this Criminal Complaint:

        a.    Medicaid was a jointly funded, federal-state health insurance program that provided certain health benefits to the disabled and individuals and families with low incomes and resources. Medicaid was created on or about July 30, 1965, through Title XIX of the Social Security Act. See Title 42, United States Code, Section 1396 et seq. In New Jersey, Medicaid was administered by the New Jersey Department of Human Services. The New Jersey Department of Law and Public Safety, Division of Consumer Affairs, Board of Nursing (hereinafter the

"New Jersey Board of Nursing") conducted background checks on prospective home health aides and, when appropriate, issued and renewed home health aide certifications based on documents and representations made by home health agencies, such as HHCH and People Choice.

b.    Under New Jersey law, certain individuals eligible for Medicaid were entitled to subsidized home health aide services.  To obtain such subsidized services, a doctor was required to examine the patient and then certify that the patient merited home health services, and a registered nurse was required to interview and examine the patient.  Thereafter, the home health agency was authorized to provide health services to the patient and was further authorized to submit bills to Medicaid for payment.

c.    In New Jersey, a private, third-party administrator received and processed bills from home health agencies and, at other times, from managed care organizations (hereinafter "MCO" or "MCOs").  The money to pay for such services originated from and belonged to the State of New Jersey and the Federal Government (which provides matching funds to the States).

d.    For a home health agency to obtain payment for Medicaid subsidized care, the home health agency was required to submit certain information to the third-party administrator and/or MCO.  The law required the home health agency to maintain all documents and records to support its bills, including the patient's clinical record and time sheets for the home health aides.

e.    Medicaid was a "health care benefit program," as that term is used in Title 18, United States Code, Section 24(b).  Furthermore, HHCH and People Choice participated in Medicaid by "providing a medical benefit, item, or service for which payment may be made under the plan or contract." See 18 U.S.C. § 24(b).

## Overview of the Scheme to Defraud

3.   Defendants Irina Krutoyarsky, Paul Mil, and their co-conspirators have fraudulently obtained millions of dollars from Medicaid through the following means:

        a.   submitting fraudulent claims to Medicaid for treatment and services not actually rendered;

        b.   fraudulently obtaining home health aide certifications for its employees and others;

        c.   submitting fraudulent claims to Medicaid for services rendered by illegal aliens and/or other individuals without the required home health aide certification;

        d.   bribing a state regulator, who was cooperating with law enforcement, to cover up and conceal the Medicaid scheme; and

        e.   laundering the proceeds of the Medicaid fraud through banks and other financial transactions to conceal the scheme, disguise the source of the illegal proceeds, and allow the scheme to continue.

## The Scheme to Fraudulently Bill Medicaid for Services Not Rendered and Obtaining Home Health Aide Certifications Through Fraud

4.   Your Affiant's investigation has revealed that defendants HHCH, People Choice, Irina Krutoyarsky, Paul Mil, and their co-conspirators defrauded Medicaid by fraudulently billing Medicaid for home health aide services not rendered to Medicaid eligible patients.

### Cooperating Witness One

5.   In or about June 2009, Cooperating Witness One contacted the Federal Bureau of Investigation on his/her own accord and reported that he/she was aware that HHCH and People Choice were engaged in Medicaid fraud.  According to Cooperating Witness One, he/she was an employee of HHCH, and defendant Irina Krutoyarsky was the owner of HHCH, a company that provided nursing and home health aide services to Medicaid-eligible and private pay patients.  Furthermore, Cooperating Witness One reported that HHCH billed Medicaid approximately $6 million each year.

Cooperating Witness One also reported that defendant Paul Mil was the owner of People Choice, another home health aide agency, and defendants Irina Krutoyarsky and Paul Mil were close personal and business associates.  In addition, according to Cooperating Witness One, HHCH defrauded Medicaid in a variety of ways, including billing Medicaid for services not rendered.  In furtherance of this scheme, Cooperating Witness One reported that HHCH's employees, at the direction of defendant Irina Krutoyarsky, fabricated and falsified information and forged signatures on HHCH time sheets to include hours not worked and services and care not provided by home health aides, thereby causing HHCH to bill Medicaid for services not rendered to patients.  Cooperating Witness One also reported that HHCH fraudulently obtained home health aide certification by falsely representing to the State of New Jersey that HHCH employees had attended the required training when, in fact, they had not. Cooperating Witness One also reported that, in some instances, home health aide applicants were not required to take the mandatory home health aide test and, in other instances, the applicants were given the answers to the test's questions by defendant Nekadam S. Galibova.

6.  At various times relevant to this Criminal Complaint, under Medicaid regulations, home health agencies, such as HHCH and People Choice, were required to make, use, and retain time sheets to, among other things, record services and care provided to Medicaid eligible patients by home health aides.  The HHCH time sheets covered weekly periods and were required to be signed by the servicing home health aide and the patient (or his or her authorized representative).  The HHCH time sheets required the home health aide to report the types of services and care rendered, such as grooming, dressing, meal preparation, and bathing, among others, and the dates and times when such services and care were rendered to the patient.  The HHCH time sheets also required the home health aide to make the following certification: "I certify that the hours worked as shows [sic] are true and accurate and worked by me.  During [sic] the days in the indicated week and were properly certified by client or client's representative at the button [sic-probably bottom] hereef [sic]."  In addition, the patient or his or her authorized representative was required to make the following certification: "I certify that the above hours are correct end [sic] that the work was performed satisfactory [sic]."  People Choice had a similar time sheet that included similar certifications.

**Defendants HHCH, People Choice, Irina Krutoyarsky, and Paul Mil-The Scheme to Bill Medicaid for Services Not Rendered and Fraudulently Obtaining Home Health Aide Certifications**

7.   According to Cooperating Witness Three, beginning in or around 2010, defendant Paul Mil began cashing checks payable to HHCH at a checking cashing business in Elizabeth, New Jersey. According to Cooperating Witness Three, in or around mid to late 2011, defendant Paul Mil asked Cooperating Witness Three if he/she or a friend was interested in becoming a certified home health aide so they could profit.  According to Cooperating Witness Three, he/she initially declined to accept defendant Paul Mil's offer.

8.   On or about January 17, 2012, Cooperating Witness Three met defendant Paul Mil in his office at People Choice.  During this consensually recorded meeting, Cooperating Witness Three asked about the procedure to obtain a home health aide certification.  Defendant Paul Mil directed Cooperating Witness Three to meet with defendant Irina Krutoyarsky regarding the home health aide certification.

9.   On or about January 31, 2012, Cooperating Witness Three met defendant Irina Krutoyarsky and Paul Mil at HHCH.  During this consensually recorded meeting (audio and video), defendant Irina Krutoyarsky offered to fraudulently obtain and provide Cooperating Witness Three a home health aide certification without him/her attending the required 76 hour course.  The following conversation ensued, in substance and in part [IK = defendant Irina Krutoyarsky; PM = defendant Paul Mil; and CW3 = Cooperating Witness Three]:

> IK:  So you wanna get the license [certification]?
>
> CW3: Yes.
>
> IK:  What's, what's, you have somebody to . . .
>
> CW3: I may be able to get some people.  Yeah. I may be able to get some people.  Yeah.
>
> IK:  If your gonna give me like [ethnic] community, you know.

* * * *

7

IK:    . . . . You cannot take care of your mother and
       father [as a home health aide].[1]

CW3:   Oh, you cannot take?

IK:    But you can take care of somebody else.  On the
       paper [on the consensually recorded video,
       defendant Irina Krutoyarsky is captured crossing
       her arms in an "X", emphasizing the "bait and
       switch" nature of this fraudulent Medicaid billing
       arrangement].

CW3:   On the paper.

IK:    I don't care.  You know, you give me two people
       and I don't care if we switch like that.
       [defendant Irina Krutoyarsky again crosses her
       arms in an "X"].  But by the law, you cannot take
       care of your family member.

CW3:   OK.

IK:    You understand?

CW3:   Yeah.

IK:    So this way we can build something.

CW3:   That's true.

IK:    For you, I gonna, I not gonna let you go to
       classes, you know.  Paul [defendant Paul Mil] told
       me. You know.

CW3:   Yeah.

IK:    I just gonna do the license for you.  You know,
       it's no problem.

CW3:   Yeah.

IK:    But everybody else, you know, ...

CW3:   Oh, everybody else, they have to. . . .

---

    1.  Under Medicaid regulations, under most circumstances,
Medicaid will not pay for home health aide services rendered by a home
health aide to his or her own family members.

8

IK:   *I'm crossing the law, you know.  I can't do that.*
       *But, you know, we have a different relationship.*
       (emphasis added).

CW3: Okay.

IK:   OK, so, um, my classes starting on February 16th.

CW3: Oh, okay.

IK:   I gonna give you a little paper now. . . . I would
      give you everything else, but my girl who would do
      it for you, let you sign everything, you know. . .
      . I cannot do it right now because on February
      16th, we start classes. . . . And I'm gonna put
      you in these classes.

CW3: So I don't have to be in the class, though?

IK:   No, but it's nobody knows.

CW3: Yeah.

IK:   Me and you, and maybe him [pointing to defendant
      Paul Mil] little bit. [All laughing].

Later during the conversation, defendant Irina Krutoyarsky stated
that she would give Cooperating Witness Three a bonus for each
patient Cooperating Witness Three brought to HHCH.  Furthermore,
during this conversation, defendants Irina Krutoyarsky and Paul
Mil explained that Cooperating Witness Three could recruit
individuals from his/her community who were taking care of their
own family members, and then, contrary to the Medicaid
regulations, have Medicaid pay for the services by disguising the
identity of the true home health aide who performed the service.
The following conversation ensued, in substance and in part:

IK:   Because [ethnic] community is still, untouched.
      Because [ethnic community] [is] very family
      oriented.  They take care of their. . . . You
      know, but if they can make the 9, 9.50 an hour. .
      . . Doing the same thing what they doing now.

CW3: Right, yeah.

IK:   You know, it's just the free money which one
      coming in.

CW3: That's true.

\* \* \* \*

PM: Main thing, the family . . . take care of my own parents, it's not the point. You have extra couple hands for nothing, government pays. That's it.

CW3: That's true.

IK: Only thing is, your not gonna take care of your mother and father. . . . in the paper, we're gonna do it like that [defendant Irina Krutoyarsky again crosses her arms, as described above]. It's only in the paper.

CW3: Oh, okay, yeah. I understand. I understand.

IK: Because it's against the law. Two girlfriends come. I'll take care of your mom. You gonna take care of mine. Paperwork. Job is done. Right Paul [defendant Paul Mil]?

PM: Absolutely.

Thereafter, defendant Paul Mil described how they billed Medicaid for services not actually rendered:

PM: It's a lot of people, a lot of people who . . . Medicaid. Government pay for the service. We can get, you know, between 10 and 18 hours [of Medicaid billing per week per patient]. *Look, people can work in a week and get paid hundred bucks a week doing nothing. Why not?* (emphasis added).

CW3: Right, yeah. So actually they don't have to work that many hours, they just. . . .

PM: It's, we don't know nothing. Two hours per day is between people who's taking care of each other. A lot of people, what they do is they show up maybe once a week to do laundry or something . . . Medicaid. Patient gets some, the home health aide gets some.

CW3: Oh, okay.

10

PM: It's be, whatever the agreement between themselves [referring to the patient and the home health aide]. . . . Some may say, don't pay me back nothing, I need once a week to come to do shopping, do the laundry, that's all I need. Do this, but that's all I need. . . . Date, I don't care, you know, what we need [to bill Medicaid is] patient last name, first name, telephone numbers. . . . birth, social security, Medicaid number, who is this emergency contact . . . .

* * * *

IK: You know so don't put down the daughter [as an emergency contact on the Medicaid paperwork] , the same daughter who wants to be the home health aide. Try to give different name. . . . So, this way we will see. Maybe it's a daughter-in-law. If they don't live in the same address, maybe we can do it. . . . But as long as these people doesn't live in the same address, so Medicaid is not gonna trace.

CW3: Oh, so otherwise they will trace. Okay.

IK: Because they do the tracings, you know. They gonna see who's working, who's not working, this and that. . . . So this way, they gonna have a free money. . . . Government, free money.

10. On or about February 23, 2012, Cooperating Witness Three met defendants Irina Krutoyarsky and Nekadam S. Galibova, among others, during a visit at HHCH. During this consensually recorded meeting (audio and video), in defendant Irina Krutoyarsky's office, defendant Irina Krutoyarsky directed defendant Nekadam S. Galibova to assist Cooperating Witness Three in fraudulently obtaining a home health aide certification by fabricating and falsifying the required documentation to obtain this state-issued certification, including, among other things, an HHCH home health aide application and employee physical examination record. The following conversation ensued, in substance and in part: [IK = defendant Irina Krutoyarsky; NG = Nekadam S. Galibova; and CW3 = Cooperating Witness Three] [italicized = spoken in the Russian language]:

IK: This is friend of mine [Cooperating Witness Three] . I want you to put him [in] the classes [the

11

required 76 hour course to obtain a state-issued
home health aide certification].

NG:  Uh-hmm.

IK:  You know, and list for him what has to be done.

NG:  Uh-hmm. . . . How much?

IK:  *You'll take 580 and you know, have him
sign everything*. . . . [to Cooperating Witness
Three] Go with her, she'll do it.

CW3: Oh good.  She's gonna do it?

IK:  She, she's gonna do it.  I just don't want people
to see.

CW3: Oh, okay. . . .  I'll fill the paperwork with her.

IK:  Her name is Nina [defendant Nekadam S. Galibova].

CW3: Oh okay, Nina.

IK:  Nina.

Thereafter, Cooperating Witness Three went to defendant Nekadam
S. Galibova's work station in HHCH, and defendant Nekadam S.
Galibova provided Cooperating Witness Three with certain
documents to complete.  Furthermore, according to Cooperating
Witness Three, he/she was required to pay a fee for obtaining the
home health aide certification, which fee included, among other
things, the cost of attending the required home health aide 76
hour training course.  As described herein, Cooperating Witness
Three did not attend this course, or any course, required to
obtain the home health aide certification.  Rather, defendants
Irina Krutoyarsky, Paul Mil, Nekadam S. Galibova, and their co-
conspirators fabricated and falsified documents and falsely
represented to the State of New Jersey that Cooperating Witness
Three had satisfactorily completed the required training to
obtain a home health aide certification.  The following
conversation ensued, in substance and in part:

NG:  Um, you have to pay, you know, yes or no?
Five-eighty, yeah she told you. . . .

CW3: How, how much?

12

```
NG:   Five-eighty.

CW3:  Oh, 580?

NG:   Because you not going, yeah?

CW3:  Huh?

NG:   You not taking class?

CW3:  No, no she just came to give the. . . .

NG:   Check.

CW3:  She's going to, just give that. . . . certificate.

NG:   Yeah.
```

Thereafter, defendant Nekadam S. Galibova discussed with
Cooperating Witness Three that he/she would not actually be
taking the mandatory home health aide test necessary for HHCH to
certify to the State of New Jersey that Cooperating Witness Three
was eligible to receive a home health aide certification:

```
NG:   . . . . I will give you a test.  Then come and I
      will give you a test. . . . Okay?

CW3:  But, I don't have to [take the mandatory test]. .
      . .  But, I don't have to?

NG:   Huh?

CW3:  But I don't have to take it [the mandatory test],
      right?

NG:   No, no.

                      * * * *

CW3:  So when, when, when do I get the certificate [the
      New Jersey issued home health aide certification]?

NG:   When you bring . . . . then I will fill out, I
      will give you form for Board of Nursing.  Then I
      will send, when you prepare everything.

CW3:  Oh, okay.
```

13

> NG:   Then I will send to Board of Nursing.   If you do
>       quick. . . . I will send quick.

After the meeting with defendant Nekadam S. Galibova, Cooperating
Witness Three again met with defendant Irina Krutoyarsky in her
office.   During this conversation, Cooperating Witness Three
asked her about the forms he/she had received from defendant
Nekadam S. Galibova.   According to Cooperating Witness Three,
he/she inquired about the forms that he/she had received from
defendant Nekadam S. Galibova.   Thereafter, defendant Irina
Krutoyarsky remarked that Cooperating Witness Three would need to
undergo a medical examination, stating, "This one I'll make for
you.   You don't have to pay money for that. . . . I make for you,
she'll [defendant Nekadam S. Galibova] make for you. . . . I'll
make for you."   According to Cooperating Witness Three, he/she
did not undergo any medical examination in connection with
his/her receipt of a New Jersey home health aide certification.

        11.   On or about March 5, 2012, Cooperating Witness Three
met defendant Nekadam S. Galibova at HHCH.   During this
consensually recorded meeting, defendant Nekadam S. Galibova
directed Cooperating Witness Three to sign attendance sheets,
falsely repreesenting that Cooperating Witness Three had attended
the required 76 hour home health aide course.   In addition,
defendant Nekadam S. Galibova provided Cooperating Witness Three
with the mandatory home health aide test and directed him to
write and sign his name on the form; however, defendant Nekadam
S. Galibova instructed Cooperating Witness Three to not date the
test.   The test, according to Cooperating Witness Three, the vast
majority of the answers to the test's questions had been
previously completed.

        12.   According to records from the New Jersey Board of
Nursing, or about March 12, 2012, it received, via U.S. Mail, an
envelope from HHCH containing, among other things, a "Homemaker-
Home Health Aide Training Program Conditional Certification
Eligibility List."   This form represented that HHCH provided the
required 76 hour home health aide course from between February
13, 2012 through February 29, 2012, and this form further falsely
represented that Cooperating Witness Three attended the course
and successfully completed it.

        13.   On or about May 12, 2012, Cooperating Witness Three
received a Home Health Aide Certification issued by the New
Jersey Board of Nursing in the mail.   This home health aide
certification authorized Cooperating Witness Three to provide
home health aide services in the State of New Jersey.   Law

enforcement officers retained a copy of this document as evidence.

14. On or about May 17, 2012, Cooperating Witness Three met defendants Irina Krutoyarsky and Paul Mil at HHCH. During this consensually recorded meeting, the following conversation ensued, in substance and in part [IK = defendant Irina Krutoyarsky; PM = defendant Paul Mil; and CW3 = Cooperating Witness Three]:

> CW3: I got the papers eh, from the state.
>
> IK:  Good!  You got it already?
>
> CW3: Yeah!
>
> IK:  So you have your certificate?
>
> CW3: Yeah the certificate. . . .
>
>                    * * * *
>
> IK:  You have to sign it and now you're a certified
>      home health aide [Laughs]. . . .
>
> CW3: [Laughs].

Thereafter, Cooperating Witness Three and defendants Irina Krutoyarsky and Paul Mil discussed a Medicaid eligible patient whom Cooperating Witness Three had recruited for the purpose of fraudulently billing Medicaid. This patient, namely, Cooperating Witness Four, who was cooperating with law enforcement. The following conversation ensued, in substance and in part:

> IK   And when you gonna bring the gentleman [the
>      patient, Cooperating Witness Four]?
>
> CW3: Yeah, I have one, one, ready already.
>
> IK:  I need.
>
> CW3: Only thing. I have more. But only thing is I
>      want to go slow so that, you know, because this,
>      they understand that, you know, if somebody is
>      making money then they can, you know, also, some
>      other people will.
>
> PM:  Yeah.

15

CW3: Come forward, you know. . . .

IK:  . . . . This money you gonna make only you and him.

CW3: Right.  Yeah.  Nobody else.  I know that but this one, one patient, yeah.

IK:  I don't know anything.  I don't know anything about. . . . You gonna give me paper every week that you work, you sign and he sign. . . . And I gonna make checks payable to you.

CW3: Oh, okay.  Okay.

IK:  *Yeah, you make money from nothing.* (emphasis added).

CW3: That's true.

IK:  Now don't list your kids.

PM:  [Interjects]  Yep, what you need money for, a, you have patient, take care of the patients, that's all. . . . *You take care of the patient if you double, you doubling pay for the services.  Double how many hours you work.  That's it.* (emphasis added).

Thereafter, they discussed the need to have the patient [Cooperating Witness Four] examined by a doctor so the patient could receive home health aide services.  When Cooperating Witness Three explained that the person was not ill, defendant Irina Krutoyarsky explained how to dupe the doctor:

CW3: This guy [the patient], lives in [Middlesex County] so you have any doctor hereby? . . . . Because he don't need. . . .

IK:  [Interjects]  Does he have any doctor?

* * * *

IK:  Also does this person when he goes he, when he gonna go to doctor?

16

> CW3: Yeah, he can go and he can do everything only thing he's, he's, you know, he's not sick, you know. He's not sick and to get the. . . .

> IK: Okay. . . . So once he goes. . . . to doctors he will tell them, you know, my hands doesn't work. I forget. . . . you know. . . . I'm very dizzy. . . . I'm very dizzy.

> PM: Get the information. . . . When you get information. . . . give it to Irina [defendant Irina Krutoyarsky]. Then she gonna. . . . advise you what's have to be done.

15. On or about July 5, 2012, during a consensually recorded meeting between Cooperating Witness Three and defendant Paul Mil, Cooperating Witness Three handed defendant Paul Mil two "Patient Intake Sheets" related to Cooperating Witness Four. One form was for HHCH and the second form was for People Choice. Each form contained Cooperating Witness Four's name, address, social security number, date of birth, Medicaid number, and emergency contact information. Law enforcement officers provided the information on the forms to Cooperating Witness Three before he/she provided the completed forms to defendant Paul Mil. Before providing the completed forms to defendant Paul Mil, Cooperating Witness Three provided a copy of each document to law enforcement.

16. On or about September 27, 2012, Cooperating Witness Three met defendant Irina Krutoyarsky at HHCH. During this consensually recorded meeting, defendant Irina Krutoyarsky verified that Cooperating Witness Four had been approved by Medicaid to receive Medicaid subsidized home health aide services. Cooperating Witness Three acknowledged that he/she had previously learned this information from defendant Paul Mil. Thereafter, the following conversation ensued, in substance and in part [IK = defendant Irina Krutoyarsky and CW3 = Cooperating Witness Three]:

> CW3: [Interjects] So what happens ah, with . . . the patient [Cooperating Witness Four] that he's approve. So he's, he doesn't need any treatment, you know that, right?

> IK: [Low Voice] Yeah.

> CW3: He doesn't need anything.

17

IK:  But nobody should know that.

CW3: No, no, nobody else.

IK:  If somebody from insurance or [whispering] my
     nurse will come he has to be dead.
CW3: Yeah, he has to act as if he's dead.

IK:  Yes. . . . But, we'll give you time slip.  You'll
     start working.  Every week you gonna send us time
     slip. . . . We send you the check.

CW3: Oh, okay.

IK:  You know what you can do, split with him
     [Cooperating Witness Four].

CW3: Oh, I split with the check with him.  So I don't,
     yeah.

IK:  I don't know nothing about it. . . . Don't make me
     in trouble.

CW3: Mm.

IK:  You work for them.  You help him out.  You wash
     him.  You give him shower.  You feed him.  You do
     this, you do that.

CW3: But he doesn't need it.  He don't need it.

IK:  But you don't understand.  I, he doesn't need it?
     So what he get money for?  He doesn't need it.

CW3: But he's approved, yeah.

IK:  He would tell that he has a service. . . . You
     come to him everyday whatever schedule we'll be,
     you come to him, everyday.  [Whispering]  He
     doesn't need it, you don't come.  You know.

CW3: Right.  Yeah.

IK:  But he [Cooperating Witness Four] has to sign . .
     . .

CW3: [Interjects]  He has to sign the time sheet, yeah.

18

> IK: And you have to sign . . . so you get some money
> from the State, we give it to you, you do whatever
> you want out of it. . . . It's not my business. .
> . . But you can not tell no one anything. . . .
> You understand that, right?

17. On or about October 12, 2012, Cooperating Witness Three entered HHCH. During this consensually recorded visit (audio and video), an HHCH office employee handed Cooperating Witness Three a pre-completed but unsigned HHCH time sheet representing home health aide services purportedly rendered by Cooperating Witness Three to Cooperating Witness Four for the week of October 7, 2012. This HHCH time sheet fraudulently represented that Cooperating Witness Three had provided approximately twenty hours of home health aide services to Cooperating Witness Four during that time period. Thereafter, in the presence of defendant Irina Krutoyarsky, Cooperating Witness Three signed his/her name on the HHCH time sheet as the treating home health aide and Cooperating Witness Four's name on the HHCH time sheet as the patient receiving the services. In truth and in fact, Cooperating Witness Three did not provide any home health aide services to Cooperating Witness Four, and Cooperating Witness Four did not receive any home health aide services during the time frame represented in the HHCH time sheet. Cooperating Witness Three then provided the signed HHCH time sheet back to the HHCH office employee.

18. On or about October 17, 2012, Cooperating Witness Three met defendant Paul Mil in the People Choice office. During this consensually recorded meeting (audio and video), Cooperating Witness Three gave one HHCH time sheet to defendant Paul Mil for the week of October 14, 2012, which time sheet represented that Cooperating Witness Three provided approximately twenty hours of home health aide services to Cooperating Witness Four during that time period. In the presence of defendant Paul Mil, Cooperating Witness Three signed his/her name on the HHCH time sheet as the treating home health aide and Cooperating Witness Four's name on the HHCH time sheet as the patient receiving the services. Defendant Paul Mil then received the form from Cooperating Witness Three. In truth and in fact, Cooperating Witness Three did not provide any home health aide services to Cooperating Witness Four, and Cooperating Witness Four did not receive any home health aide services during the time frame represented in the HHCH time sheet.

19. On or about October 23, 2012, Cooperating Witness Three met defendant Paul Mil in the People Choice office. During this consensually recorded meeting (audio), Cooperating Witness Three gave one HHCH time sheet to defendant Paul Mil for the week of October 21, 2012, which time sheet represented that Cooperating Witness Three provided approximately twenty hours of home health aide services to Cooperating Witness Four during that time period. In the presence of defendant Paul Mil, Cooperating Witness Three signed his/her name on the time sheet as the treating home health aide and Cooperating Witness Four's name on the time sheet as the patient receiving the services. Defendant Paul Mil then received the form from Cooperating Witness Three. In truth and in fact, Cooperating Witness Three did not provide any home health aide services to Cooperating Witness Four, and Cooperating Witness Four did not receive any home health aide services during the time frame represented in the time sheet. During this meeting, Cooperating Witness Three stated he/she would not be seeing the patient [Cooperating Witness Four] for a couple of weeks. Defendant Paul Mil responded that it was "okay" and reminded Cooperating Witness Three to have Cooperating Witness Four use a cane during nurse visits.

20. On or about November 6, 2012, Cooperating Witness Three met defendant Paul Mil in the People Choice office. During this meeting, according to Cooperating Witness Three, he/she gave four HHCH time sheets to defendant Paul Mil for the weeks of October 28, 2012, November 4, 2012, November 11, 2012 (completely filled out and post dated), and November 18, 2012 (completely filled out and post dated), which time sheets represented that Cooperating Witness Three provided approximately twenty hours of home health aide services to Cooperating Witness Four per week during each time period. According to Cooperating Witness Three, Cooperating Witness Three signed his/her name on the time sheets as the treating home health aide and Cooperating Witness Four's name on the time sheets as the patient receiving the services. Defendant Paul Mil then received the forms from Cooperating Witness Three. In truth and in fact, Cooperating Witness Three did not provide any home health aide services to Cooperating Witness Four, and Cooperating Witness Four did not receive any home health aide services during the time frames represented in these time sheets.

21. On or about November 19, 2012, Cooperating Witness Three met defendants Irina Krutoyarsky and Paul Mil at HHCH. During this consensually recorded meeting, Cooperating Witness Three mentioned that his/her patient [Cooperating Witness Four] was traveling out of the area [and therefore not receiving home health aide services]. The following conversation ensued, in

20

substance and in part [IK = defendant Irina Krutoyarsky; PM = defendant Paul Mil; and CW3 = Cooperating Witness Three]:

> CW3: So um.  Yeah so, make sure that he [Cooperating Witness Four], you know; he's out, maybe out for two weeks.  If you want he'll go, but I think he said there's no need.
>
> IK:  He still. . . .
>
> CW3: He's out.
>
> IK:  Not out of the country, no problem.
>
> CW3: No he's only here.  He's only in New York.
> IK:  If he's . . . . out of the country it's a problem because it's registered.
>
> CW3: Oh, okay.  So the passport.
>
> IK:  If he is in New York . . . . Florida. . . . or whatever, I don't know.
>
> CW3: No problem, uh.
>
> IK:  Okay? . . . . So nobody don't know this?
>
> CW3: No, no, nobody knows except we of course.
>
> IK:  No just us.  [Snicker].
>
> CW3: Yeah.  [Snicker]  Okay.
>
> IK:  Most people don't know.

     22.  On or about November 28, 2012, Cooperating Witness Three met defendant Paul Mil in the People Choice office.  During this consensually recorded meeting (audio), at the direction of defendant Paul Mil, Cooperating Witness Three placed six HHCH time sheets in a bin located in defendant Paul Mil's office. These time sheets pertained to the weeks of November 25, 2012, December 2, 2012 (completely filled out and post dated), December 9, 2012 (completely filled out and post dated), December 16, 2012 (completely filled out and post dated), December 23, 2012 (completely filled out and post dated), and December 30, 2012 (completely filled out and post dated), which time sheets represented that Cooperating Witness Three provided approximately twenty-one hours per week of home health aide services to

Cooperating Witness Four during each time period. Before placing the forms in the bin, Cooperating Witness Three signed his/her name on the time sheets as the treating home health aide and Cooperating Witness Four's name on the time sheets as the patient receiving the services. In truth and in fact, Cooperating Witness Three did not provide any home health aide services to Cooperating Witness Four, and Cooperating Witness Four did not receive any home health aide services during the time frames represented in these time sheets.

23. Each HHCH time sheet referred to in Paragraphs 18 through 22 above consisted of an original (white) and two carbon copies (yellow and pink). Cooperating Witness Three provided the original (white) form to the individuals described above. After meeting with defendants Irina Krutoyarsky, Paul Mil, or their co-conspirators on each occasion, Cooperating Witness Three gave the yellow and pink carbon copies to law enforcement officers, which documents were retained as evidence.

24. According to records from an MCO, as of late 2012, HHCH has billed Medicaid and has received approximately $3,336 for home health aide services reportedly rendered to Cooperating Witness Four.

25. On or about November 29, 2012, Cooperating Witness Three met defendant Irina Krutoyarsky at HHCH. During this consensually recorded meeting, they discussed splitting Cooperating Witness Three's HHCH home health aide wages derived from the scheme with Cooperating Witness Four. Furthermore, during this conversation, Cooperating Witness Three again informed defendant Irina Krutoyarsky that he/she had not seen Cooperating Witness Four. In addition, during this meeting, defendant Nekadam S. Galibova gave Cooperating Witness Three three HHCH checks payable to Cooperating Witness Three (see Paragraph 26 below for a summary of these checks). The following conversation ensued, in substance and in part [IK = defendant Irina Krutoyarsky and CW3 = Cooperating Witness Three]:

> CW3: See this guy [Cooperating Witness Four], right, I, he haven't paid him yet cause I didn't take anything here. So how, how much you think we should, I should pay him? How much usually, you base pay? What percentage?
>
> IK: [Low Voice] You, you charge him 50, 50.
>
> CW3: Oh 50, 50?

IK: Yeah, you don't go to him, right [visit Cooperating Witness Four and provide home health aide services]?

CW3: Hmm?

IK: You don't go to him, right?

CW3: Say that again?

IK: You don't go to him [the purported patient, Cooperating Witness Four]. You don't.

CW3: No, I don't go to him, yeah.

IK: Okay, so it's.

CW3: But usually, how much you get to 50, 50?

IK: . . . . Pay him 50, 50,. . . . . Give him, take yourself 55 percent, give him 45 because in case if you have to . . . pay somethin' on the taxes later on. . . . So give him 45. You, you explain to.

\* \* \* \*

IK: Here's the money for you. You know, use it for the good health. So he would be happy. . . . for nothing.

CW3: No not only him, see how, few more guys [referring to additional patients] who are waiting to do the same thing.

IK: I think it's a good idea. . . . Free money, it's just free money.

CW3: It's free, yeah. . . . Yeah, we're not suppose to tell anybody. [Giggles] I know that yeah.

26. On or about November 29, 2012, Cooperating Witness Three received three checks from defendant Nekadam S. Galibova. These checks represented pay for Cooperating Witness Three's sham employment with HHCH as a home health aide, and, in particular, for purportedly providing home health aide services to Cooperating Witness Four. In truth and in fact, Cooperating Witness Three did not provide any home health aide services to

23

Cooperating Witness Four or any Medicaid eligible patients, and
no Medicaid eligible patients received care from Cooperating
Witness Three.  These HHCH checks reveal the following:

| Date of Check and Pay Period | Payor | Payee | Amount | Reported YTD Wages |
|---|---|---|---|---|
| 10/26/12<br><br>10/7-10/20/12 | HHCH (HHCH Payroll Account) | Cooperating Witness Three | $352.04 | $16,345 |
| 11/9/12<br><br>10/21-11/3/12 | HHCH (HHCH Payroll Account) | Cooperating Witness Three | $352.04 | $17,545 |
| 11/23/12<br><br>not reported | HHCH (HHCH Operating Account) | Cooperating Witness Three | $360.25 | $17,545 |

## The Scheme to Fraudulently Obtain Home Health Aide Certifications from the New Jersey Board of Nurses

27.  As described above, Cooperating Witness One advised
that defendant HHCH, and its co-conspirators, fraudulently
obtained home health aide  certifications by, among other ways,
fabricating and falsifying documents and records related to home
health aide training, including the mandatory testing.   In
addition, as described above, Cooperating Witness Three
fraudulently obtained a home health aide  certification with the
assistance of defendants Irina Krutoyarsky, Paul Mil, Nekadam S.
Galibova, and others.

28.  On or about November 2, 2011, Undercover Agent One
visited HHCH.  During this consensually recorded meeting (audio
and video), defendant Irina Krutoyarsky agreed to obtain a home
health aide certification for Undercover Agent One, without
him/her attending the required home health aide course.
Thereafter, defendant Irina Krutoyarsky referred Undercover Agent
One to defendant Nekadam S. Galibova to complete the paperwork
necessary to obtain the home health aide certification.
Undercover Agent One then met with defendant Nekadam S. Galibova
who, among other things, had Undercover Agent One sign undated
attendance sheets for the training course.  Ultimately, however,
Undercover Agent One did not receive a home health aide
certification.  During this meeting, the following conversation
ensued, in substance and in part [IK = defendant Irina
Krutoyarsky; CW1 = Cooperating Witness One; and UC1 = Undercover
Agent One]:

24

CW1: How are you?  I brought my friend so you can um, for the classes. . . . I just wanted you to meet [the person].

UC1: Hey.  How are you?

IK: Remember me?

UC1: I met you before. . . .

IK: Yes.

* * * *

IK: So you wanna go to the classes?

UC1: Yes.

IK: Good so.  She'll, she'll attend the classes?

CW1: No, see if we can just put her through cause she, she's got kids and stuff, and she works as a nanny.

IK: Would she work?

CW1: For now, nanny

UC1: I take care of ah, little boy.  It's a friend.

IK: Are you planning to, to work some time, part time, anything? . . . .

* * * *

IK: [Interjects]  Why do you need the licenses, if you know, license?

CW1: Well cause some times, you know, they leave for a while.  So she's not working and it's under the table.  So you need to put her social security to work there.

UC1: Yeah, it's kind of like.

IK: So you want me to put your social security to work?

25

CW1: . . . .So like if we need, if you need her for like, you know, whatever.

IK:   Sonia [defendant Sonia Mesa].

CW1: [Interjects] Yeah. . . . Sonia Mesa, when she has like, you know, 150 hours [Your Affiant's investigation has revealed that defendant Irina Krutoyarsky does not pay overtime to her employees, as required by state and federal law. To circumvent these labor laws, defendant Irina Krutoyarsky recruits "straw" employees and pays them at the standard wage rate rather than the overtime rate earned by the true employee].

IK:   Uh-hmm.  Okay. . . . .

* * * *

CW1: So who she see Nina [defendant Nekadam S. Galibova] to fill out all the paperwork?

IK:   Mm-hmm.

Thereafter, Cooperating Witness One and Undercover Agent One met with defendant Nekadam S. Galibova to discuss the home health aide certification and the mandatory test.  Cooperating Witness One asked, "Hey Nina, you put the answers in or she gotta put the answers in?  Okay."  Defendant Nekadam S. Galibova replied, "Just put name right here."

## Defendant Nekadam S. Galibova-The Scheme to Bill Medicaid for Services Not Rendered

29.   According to Cooperating Witness One, defendant Nekadam S. Galibova is a full-time HHCH office employee and is also employed for HHCH as a home health aide.  Furthermore, according to Cooperating Witness One, defendant Nekadam S. Galibova has altered HHCH's training records to falsely represent that individuals had attended and completed the required home health aide training course.  The investigation has revealed that defendant Nekadam S. Galibova, and her co-conspirators, cause Medicaid to be billed for services not rendered to Medicaid eligible patients.

30.   According to records from the New Jersey Department of Labor, defendant Nekadam S. Galibova has received wages from HHCH from in or around 2007 through in or around the third quarter of

2012, as follows (all approximate): $30,000 (2007); $39,000 (2008); $38,900 (2009); $27,000 (2010); $20,700 (2011); and $15,400 (through third quarter 2012). In addition, according to records from the New Jersey Department of Labor, defendant Nekadam S. Galibova has also received wages from People Choice from in or around 2010 through the third quarter of 2012, as follows (all approximate): $14,800 (2010); $23,700 (2011); and $18,500 (through third quarter 2012).

31. According to Cooperating Witness One, defendant Nekadam S. Galibova and her co-conspirators billed Medicaid for home health aide services allegedly provided to a patient with the initials M.N from Union, New Jersey (hereinafter "Patient M.N.").

32. According to records from a law enforcement database, between on or about July 27, 2009 and on or about August 4, 2009, Patient M.N. traveled to Canada. As part of this investigation, law enforcement officers have obtained HHCH time sheets for the periods between on or about July 27, 2009 and July 31, 2009 and August 3-4, 2009 related to Patient M.N. Each of these HHCH time sheets bear defendant Nekadam S. Galibova's purported signature (as the treating home health aide) and represent that she provided home health aide services, such as grooming, dressing, meal preparation, and bathing, to Patient M.N. during the same time period this patient was in Canada. In addition, these HHCH time sheets bear the purported signature of Patient M.N. (or his authorized representative), attesting that he received the services as claimed on the form. According to Medicaid records, HHCH was paid approximately $339 by Medicaid for seven days of alleged home health aide services while Patient M.N. was in Canada.

33. According to Cooperating Witness One, from on or about January 3, 2011 through on or about January 17, 2011, defendant Nekadam S. Galibova was out of the HHCH office and on vacation in Israel. According to records from a law enforcement database, defendant Nekadam S. Galibova traveled to Israel from on or about January 3, 2011 through on or about January 17, 2011. Furthermore, according to Cooperating Witness One, multiple time sheets were submitted to HHCH representing that defendant Nekadam S. Galibova provided home health aide services to three different Medicaid eligible patients, including Patient M.N., covering the same time periods in which defendant Nekadam S. Galibova was overseas. As part of this investigation, law enforcement officers have obtained HHCH time sheets for the period between on or about January 3, 2011 through on or about January 17, 2011. These HHCH time sheets represented that defendant Nekadam S. Galibova provided home health aide services to three different

27

patients, including Patient M.N, during the period defendant Nekadam S. Galibova was in Israel. For example, HHCH time sheets bearing defendant Nekadam S. Galibova's purported signature (as the treating home health aide) represent that she provided home health aide services, such as grooming, dressing assistance, meal preparation, bathing, and light cleaning, to Patient M.N. between January 3, 2011 and January 7, 2011; and January 10, 2011 through January 14, 2011. According to Medicaid records, HHCH was paid approximately $460 by Medicaid for ten days of alleged home health aide services provided to Patient M.N. while defendant Nekadam S. Galibova was in Israel.

## Defendant Bella Fridman-The Scheme to Bill Medicaid for Services Not Rendered

34. According to Cooperating Witness One, defendant Bella Fridman allegedly works as an HHCH home health aide. Cooperating Witness One reports that he/she has observed defendant Bella Fridman, at HHCH, signing HHCH time sheets as a home health aide, and signing (i.e., forging) patients' names on these time sheets.

35. On or about October 22, 2009, law enforcement officers conducted surveillance near defendant Bella Fridman residence in East Brunswick, New Jersey, beginning at approximately 7:00 a.m. At approximately 7:45 a.m., defendant Bella Fridman was observed leaving her residence, traveling to a nearby shopping center, and then returning to her residence at approximately 8:15 a.m. At approximately 9:15 a.m., defendant Bella Fridman was observed leaving her residence and then arriving at a nail salon near Matawan, New Jersey (hereinafter the "Nail Salon") at 9:38 a.m. Defendant Bella Fridman was observed remaining inside this Nail Salon from approximately 9:38 a.m. until approximately 12:20 p.m. At approximately 12:10 p.m., law enforcement officers followed defendant Bella Fridman from Matawan, New Jersey back to her residence, arriving at approximately 12:45 p.m. From approximately 12:50 p.m., through approximately 2:15 p.m., law enforcement officers observed defendant Bella Fridman running errands. Thereafter, at approximately 4:00 p.m., defendant Bella Fridman was observed returning to her residence, where she remained inside her residence until surveillance was discontinued at approximately 5:30 p.m. At no time during the surveillance conducted on this day was defendant Bella Fridman observed entering the residences of any known Medicaid eligible patients.

36. As part of this investigation, law enforcement officers have obtained four HHCH time sheets covering the period including October 22, 2009, the date in which law enforcement officers surveilled defendant Bella Fridman. These time sheets

bear defendant Bella Fridman's purported signature (as the treating home health aide).  Contrary to observations made by law enforcement officers while conducting surveillance on defendant Bella Fridman, on or about October 22, 2009, the HHCH time sheets report the following:

| Date | Patient's Initials | Times Reported | Pertinent Services Allegedly Rendered |
|------|------|------|------|
| 10/22/09 | M.K. | 6:00 a.m.-8:00 a.m. | sponge bathing, mouth care, shampooing, dressing, toileting, assistance with ambulation, and meal preparation, serving, among others |
| 10/22/09 | E.K. | 8:30 a.m.-9:30 a.m. | sponge/shower, mouth care, shampooing, dressing, and assistance with ambulation, among others |
| 10/22/09 | V.S. | 9:30 a.m.-10:30 a.m. | sponge/shower, mouth care, grooming, dressing, and assistance with ambulation, among others |
| 10/22/09 | S.K. | 4:00 p.m.-5:00 p.m. | meal preparation, serving, feeding, light cleaning, assistance with relearning activities of daily living, among others |

      b.  According to Medicaid records, HHCH was paid approximately $104 by Medicaid for alleged home health aide services provided to these four patients on October 22, 2009.

    37.  On or about February 18, 2010, law enforcement officers conducted surveillance near defendant Bella Fridman's residence in East Brunswick, New Jersey, beginning at approximately 9:45 a.m.  At approximately 10:10 a.m., defendant Bella Fridman was observed leaving her residence, was followed, was observed arriving at the Nail Salon at approximately 10:50 a.m.  At

approximately 11:50 a.m., Undercover Agent Two entered the Nail Salon and had his/her nails polished by defendant Bella Fridman, which transaction was consensually recorded. At approximately 12:35 p.m., Undercover Agent Two departed the Nail Salon. Based on the investigation, Your Affiant believes that defendant Bella Fridman is employed at the Nail Salon, even though the New Jersey Department of Labor reports defendant Bella Fridman receiving no wages from this place of business.

a. As part of this investigation, law enforcement officers have obtained an HHCH time sheet covering the period including February 18, 2010, the date in which law enforcement officers surveilled defendant Bella Fridman and conducted an undercover operation, as described above. This HHCH time sheet bears defendant Bella Fridman's purported signature (as the treating home health aide). Contrary to observations made by law enforcement officers and Undercover Agent Two on or about February 18, 2010, the HHCH time sheet reports the following:

| Date | Patient's Initials | Times Reported | Pertinent Services Allegedly Rendered |
|------|-----------|----------------|---------------------|
| 2/18/10 | V.S. | 9:30 a.m.-11:30 a.m. | sponge/shower, mouth care, grooming, dressing, and assistance with ambulation, among others |

b. According to Medicaid records, HHCH was paid approximately $32 by Medicaid for alleged home health aide services provided to this patient on this date.

38. According to records from a law enforcement database, defendant Bella Fridman traveled to Cancun, Mexico from between on or about March 30, 2010 and on or about April 6, 2010. As part of this investigation, law enforcement officers have obtained HHCH time sheets for the periods between on or about March 28, 2010 through on or about April 3, 2010 and on or about April 4, 2010 through on or about April 10, 2010. These HHCH time sheets represent that defendant Bella Fridman provided home health aide services to four different patients during the period she was in Cancun, Mexico. These HHCH time sheets bear defendant Bella Fridman's purported signature (as the treating home health aide) and represent that she provided home health aide services, such as mouth care, dressing, meal preparation, and sponge bathing, among other things, to patients during the entire time period she was in Cancun, Mexico. According to Medicaid records,

30

HHCH was paid approximately $787 by Medicaid for eight days of alleged home health aide services provided to these four patients while defendant Bella Fridman was in Cancun, Mexico.

39. According to records from a law enforcement database, defendant Bella Fridman traveled to Panama from between on or about April 2, 2011 and on or about April 12, 2011. As part of this investigation, law enforcement officers have obtained HHCH time sheets for the periods between on or about March 27, 2011 through on or about April 2, 2011, on or about April 3, 2011 through on or about April 9, 2011, and on or about April 10, 2011 through on or about April 16, 2011. These HHCH time sheets represent defendant Bella Fridman provided home health aide services to three different patients during the period she was in Panama. These HHCH time sheets bear defendant Bella Fridman's purported signature (as the treating home health aide) and represent that she provided home health aide services, such as mouth care, dressing, meal preparation, and sponge bathing, among other things, to patients during the entire time period she was in Panama. According to Medicaid records, HHCH was paid approximately $906 by Medicaid for eleven days of alleged home health aide services provided to these three patients while defendant Bella Fridman was in Panama.

40. According to records from the New Jersey Department of Labor, defendant Bella Fridman has received wages from HHCH from in or around 2007 through in or around the third quarter of 2012, as follows (all approximate): $26,500 (2007); $23,500 (2008); $23,497 (2009); $24,400 (2010); $19,200 (2011); and $15,495 (through third quarter 2012). In addition, according to records from the New Jersey Department of Labor, defendant Bella Fridman has also received wages from People Choice from in or around 2011 through the third quarter of 2012, as follows (all approximate): $700 (2011) and $4,100 (through third quarter 2012). According to records from the New Jersey Department of Labor, defendant Bella Fridman has no reported wages from the Nail Salon.

## Defendants Lilia Berstein and Malvina Frolova-The Scheme to Bill Medicaid for Services Not Rendered

41. According to Cooperating Witness One, defendants Lilia Berstein and Malvina Frolova allegedly work as HHCH home health aides, and Cooperating Witness One has observed defendants Lilia Berstein and Malvina Frolova, at various times, entering HHCH to retrieve their payroll checks.

31

42. On or about January 22, 2010, a law enforcement officer conducted surveillance near defendant Lilia Berstein's residence in Old Bridge, New Jersey, beginning at approximately 7:50 a.m. At approximately 10:00 a.m., defendant Lilia Berstein was observed leaving her residence, was followed, and was observed arriving at defendant Malvina Frolova's residence near Parlin, New Jersey at approximately 10:12 a.m. Thereafter, defendant Malvina Frolova entered defendant Lilia Berstein's car. Law enforcement officers then followed defendants Lilia Berstein and Malvina Frolova to a parking lot near HHCH's building. At approximately 10:37 a.m., both defendants were observed entering HHCH. At approximately 11:05 a.m., defendants Lilia Berstein and Malvina Frolova were observed entering a nearby store, and they were observed leaving the store at approximately 11:20 a.m. From approximately 11:20 a.m. until approximately 6:00 p.m., law enforcement officers surveilled defendant Lilia Berstein, and at no time during this period was she observed entering the residences of any known Medicaid eligible patients. From approximately 11:20 a.m. until approximately 7:00 p.m., law enforcement officers surveilled defendant Malvina Frolova, and at no time during this period was she observed entering the residences of any known Medicaid eligible patients.

43. As part of this investigation, law enforcement officers have obtained several HHCH time sheets corresponding to January 22, 2010, the date in which law enforcement officers surveilled defendants Lilia Berstein and Malvina Frolova, as described above.

a. Your Affiant has reviewed three HHCH time sheets bearing defendant Lilia Berstein's purported signature (as the treating home health aide) dated January 22, 2010 related to the patients below. Contrary to observations made by law enforcement officers while conducting surveillance on or about January 22, 2010, these HHCH time sheets report the following:

| Date | Patient's Initials | Times Reported | Pertinent Services Allegedly Rendered |
|------|--------------------|----------------|---------------------------------------|
| 1/22/10 | E.D.#1 | 6:00 a.m.-8:00 a.m. | shower, denture care, shampoo, dressing, toileting, and assistance with ambulation, among others |

| Date | Patient's Initials | Times Reported | Pertinent Services Allegedly Rendered |
|------|---------|---------|---------|
| 1/22/10 | A.S.#1 | 8:30 a.m.-9:30 a.m. | shower, denture care, shampoo, dressing, toileting, and assistance with ambulation, among others |
| 1/22/10 | A.S.#1 | 5:00 p.m.-6:00 p.m. | meal preparation, servicing, and assistance with relearning activities of daily living, among others |

        b.    According to Medicaid records, HHCH was paid
approximately $59 by Medicaid for alleged home health aide
services provided to these patients on this date.

        c.    Your Affiant has reviewed two HHCH time sheets
bearing defendant Malvina Frolova's purported signature (as the
treating home health aide) and covering the period including
January 22, 2010 related to the patients below.  Contrary to
observations made by law enforcement officers while conducting
surveillance on or about January 22, 2010, these HHCH time sheets
report the following:

| Date | Patient's Initials | Times Reported | Pertinent Services Allegedly Rendered |
|------|---------|---------|---------|
| 1/22/10 | T.G. | 7:00 a.m.-9:00 a.m. | shower, mouth care, shampoo, dressing, toileting, and assistance with ambulation, among others |
| 1/22/10 | Y.R. | 6:00 p.m.-9:00 p.m. | shower, mouth care, shampoo, dressing, toileting, and assistance with ambulation, among others |

33

d.   According to Medicaid records, HHCH was paid approximately $80 by Medicaid for alleged home health aide services provided to these patients on this date.

44.   On or about February 4, 2011, law enforcement officers conducted surveillance near defendant Lilia Berstein's residence in Old Bridge, New Jersey, beginning at approximately 5:45 a.m.  At approximately 10:02 a.m., defendant Lilia Berstein was observed leaving her residence and entering her car. Thereafter, law enforcement officers followed her to defendant Malvina Frolova's residence, where she arrived at approximately 10:25 a.m.   Thereafter, defendant Malvina Frolova entered defendant Lilia Berstein's car.  Law enforcement officers then followed defendants Lilia Berstein and Malvina Frolova to a parking lot near HHCH's building, where they arrived at approximately 11:00 a.m.  From approximately 11:00 a.m. until approximately 1:50 p.m., law enforcement officers surveilled defendants Lilia Berstein and Malvina Frolova, and at no time during this period were they observed entering the residences of any known Medicaid eligible patients.

a.   Your Affiant has reviewed three HHCH time sheets bearing defendant Lilia Berstein's purported signature (as the treating home health aide) dated February 4, 2011 for the patients below.  Contrary to observations made by law enforcement officers while conducting surveillance on or about February 4, 2011, these HHCH time sheets report the following:

| Date | Patient's Initials | Times Reported | Pertinent Services Allegedly Rendered |
|------|--------------------|----------------|----------------------------------------|
| 2/4/11 | E.D.#1 | 6:00 a.m.-8:00 a.m. | shower, denture care, shampoo, dressing, toileting, and assistance with ambulation, among others |
| 2/4/11 | A.S.#1 | 9:00 a.m.-10:00 a.m. | shower, denture care, shampoo, dressing, toileting, and assistance with ambulation, among others |

34

| Date | Patient's Initials | Times Reported | Pertinent Services Allegedly Rendered |
|---|---|---|---|
| 2/4/11 | A.M. | 11:00 a.m.-1:00 p.m. | bathing, mouth care, hair care, dressing, assistance with ambulation, meal preparation, among others |

       b.    According to Medicaid records, HHCH was paid approximately $90 by Medicaid for alleged home health aide services provided to these patients on this date.

     45.  On or about February 18, 2011, law enforcement officers conducted surveillance of both defendants Lilia Berstein and Malvina Frolova from approximately 6:30 a.m. to approximately 11:15 a.m.  Law enforcement officers observed both defendants entering HHCH's building at approximately 10:42 a.m.  During this period of surveillance, neither defendant Lilia Berstein nor Malvina Frolova were observed entering the residence of any known Medicaid eligible patient, including Patients A.S.#1 and A.S.#2.

       a.    Your Affiant has reviewed three HHCH time sheets bearing defendant Lilia Berstein purported signature (as the treating home health aide) covering the period including February 18, 2011.  Contrary to observations made by law enforcement officers while conducting surveillance on or about February 18, 2011, these HHCH time sheets report the following:

| Date | Patient's Initials | Times Reported | Pertinent Services Allegedly Rendered |
|---|---|---|---|
| 2/18/11 | E.D.#1 | 6:00 a.m.-8:00 a.m. | shower, denture care, shampoo, dressing, toileting, and assistance with ambulation, among others |
| 2/18/11 | A.S.#2 | 9:00 a.m.-10:00 a.m. | shower, denture care, shampoo, dressing, toileting, and assistance with ambulation, among others |

35

| Date | Patient's Initials | Times Reported | Pertinent Services Allegedly Rendered |
|------|--------------------|----------------|----------------------------------------|
| 2/18/11 | A.M. | 11:00 a.m.-1:00 p.m. | bathing, mouth care, hair care, dressing, assistance with ambulation, meal preparation, among others |

b.    According to Medicaid records, HHCH was paid approximately $90 by Medicaid for alleged home health aide services provided to these patients on this date.

c.    Your Affiant has reviewed one HHCH time sheet bearing defendant Malvina Frolova's purported signature (as the treating home health aide) for the period covering February 18, 2011 for the patient below. Contrary to observations made by law enforcement officers while conducting surveillance on or about February 18, 2011, this HHCH time sheet reports the following:

| Date | Patient's Initials | Times Reported | Pertinent Services Allegedly Rendered |
|------|--------------------|----------------|----------------------------------------|
| 2/18/11 | T.G. | 7:00 a.m.-9:00 a.m. | bathing, mouth care, shampoo, dressing, meal preparation, among others |

d.    According to Medicaid records, HHCH was paid approximately $31 by Medicaid for alleged home health aide services provided to this patient on this date.

46.    On or about August 30, 2011, at approximately 8:00 a.m., a law enforcement officer conducted surveillance near the residence of Medicaid eligible patients from Highland Park, New Jersey with the initials A.S. and A.S. (hereinafter "Patient A.S.#1" and "Patient A.S.#2")(the same patients referred to in Paragraphs 44 and 45 above). At approximately 10:40 a.m., a law enforcement officer observed Patients A.S.#1 and A.S.#2 entering a car and then driving away from the area. From approximately 10:40 a.m. until approximately 1:00 p.m., Patients A.S.# 1 and A.S.#2 were observed visiting a doctor's office and a dentist's office, and then walking in a park. Later, at approximately 1:50 p.m., Patients A.S.#1 and A.S.#2 were observed entering their

36

residence, where they remained until approximately 3:28 p.m.
Between approximately 1:50 p.m. and approximately 3:28 p.m.,
neither defendant Lilia Berstein nor Malvina Frolova were
observed entering this residence. According to Medicaid records,
HHCH was paid approximately $54 by Medicaid for alleged home
health aide services provided to these patients on this date.

47. According to records from the New Jersey Department of
Labor, defendant Lilia Berstein has received wages from HHCH from
in or around 2007 through in or around the third quarter of 2012,
as follows (all approximate): $9,700 (2007); $11,497 (2008);
$16,700 (2009); $15,100 (2010); $16,000 (2011); and $11,300
(through third quarter 2012). In addition, according to records
from the New Jersey Department of Labor, defendant Lilia Berstein
has also received wages from People Choice from in or around 2007
through 2008, as follows (all approximate): $5,200 (2007) and
$18,00 (2008).

48. According to records from the New Jersey Department of
Labor, defendant Malvina Frolova has received wages from HHCH
from in or around 2008 through in or around the third quarter of
2012, as follows (all approximate): $16,100 (2008); $24,100
(2009); $21,600 (2010); $16,795 (2011); and $12,250 (through
third quarter 2012).

## The Scheme to Bill Medicaid Using "Nominee" Home Health Aides

49. Your Affiant's investigation has revealed that
defendants HHCH, People Choice, Irina Krutoyarsky, Paul Mil, and
their co-conspirators defrauded Medicaid by employing illegal
aliens and other individuals without the required home health
aide certifications, dispatching them to Medicaid eligible
patients' home to provide services that they are not authorized
to provide, and then billing Medicaid by falsely representing
that the services had been rendered by certified home health
aides. By employing illegal aliens and other individuals lacking
the required home health aide certification, defendants Irina
Krutoyarsky, Paul Mil, and their co-conspirators, profited by
paying lower wages and no overtime to these workers.

## Defendants Alla Neymet, Leonora Popesku, Sonia Mesa, and Nelson Mesa

50. According to Cooperating Witness One, defendants Irina Krutoyarsky and Paul Mil, on behalf of HHCH and People Choice, respectively, recruited and hired individuals, including illegal aliens, who neither possessed social security numbers nor home health aide certifications. Cooperating Witness One reported that defendants Irina Krutoyarsky and Paul Mil, and their co-conspirators, then dispatched these illegal aliens and/or uncertified individuals to the respective residences of Medicaid eligible patients. Thereafter, according to Cooperating Witness One, defendant Irina Krutoyarsky and Paul Mil, and their co-conspirators, billed Medicaid on behalf of these patients, representing to Medicaid that such services had been provided by certified home health aides. According to a representative of Medicaid, if the home health aide service was not provided by a certified home health aide, then Medicaid was not required to pay the claim.

51. Cooperating Witness One has reported that defendants Leonora Popesku, Alla Neymet, and others, all of whom have New Jersey issued home health aide certifications, are reported, on paper, as HHCH home health aides; however, these individuals do not actually provide home health aide services to any patients. Instead, according to Cooperating Witness One, defendants Irina Krutoyarsky and Paul Mil, and their co-conspirators, used the names and home health aide certifications of defendants Leonora Popesku, Alla Neymet, and numerous others to bill Medicaid for services rendered by illegal aliens and/or uncertified individuals, such as defendant Sonia Mesa. According to Cooperating Witness One and as corroborated through a government database concerning immigration and citizenship status, defendant Sonia Mesa is not a lawful resident of the United States. Furthermore, according to the New Jersey Board of Nursing, at all times relevant to this Criminal Complaint, defendant Sonia Mesa did not possess a valid New Jersey issued home health aide certification. In addition, according to Cooperating Witness One, during the course of his/her employment with HHCH, he/she has observed defendant Irina Krutoyarsky or others schedule, or cause to be scheduled, defendants Leonora Popesku, Alla Neymet, and others to visit Medicaid eligible patients for the purpose of ostensibly providing home health aide services. For example:

a. Cooperating Witness One has reported that defendant Sonia Mesa purportedly rendered home health aide services, at various times, to a couple in Union, New Jersey with the initials J.D. and E.D. (hereinafter "Patient J.D." and

"Patient E.D.#2"). These home health aide services, however, were falsely reported as being provided by defendant Alla Neymet. Thereafter, HHCH and People Choice issued payroll checks to defendant Alla Neymet, which checks defendant Sonia Mesa endorsed and then negotiated through her own bank account.

(i) On several occasions, including August 11, 25, 2009, November 17, 18, 20, 23, and 2009, January 11, 2010, and June 11, 2010, law enforcement officers conducted surveillance of Alla Neymet. During each surveillance, defendant Alla Neymet was not observed visiting any known Medicaid eligible patients; rather, she was observed either at her residence or her place of employment in Edison, New Jersey.

(ii) On or about August 25, 2009, a law enforcement officer conducted surveillance near the residence of defendants Nelson Mesa and Sonia Mesa in Elizabeth, New Jersey. In summary, law enforcement officers made the following observations, among others, on that day: (a) at approximately 7:15 a.m., defendant Nelson Mesa was observed leaving his residence in his car with defendant Sonia Mesa as a passenger; (b) at approximately 7:37 a.m., defendant Sonia Mesa was observed exiting the car and entering the residence of Patient J.D. and Patient E.D.#2 in Union County, New Jersey; (c) at approximately 1:45 p.m., defendant Sonia Mesa departed the residence of Patient J.D. and Patient E.D.#2 and entered a car driven by defendant Nelson Mesa; (d) at approximately 1:54 p.m, defendant Sonia Mesa, driven by defendant Nelson Mesa, returned to the residence of Patient J.D. and Patient E.D.#2; (e) at approximately 6:44 p.m., defendant Nelson Mesa returned to the residence of Patient J.D. and Patient E.D.#2 in a car, picked up defendant Sonia Mesa, and they departed; and (f) Defendants Nelson Mesa and Sonia Mesa were followed to People Choice's building. Thereafter, defendant Sonia Mesa was observed carrying pink and white paperwork (time sheets) toward the entrance of People Choice's building.

(iii) Your Affiant has reviewed two HHCH time sheets bearing defendant Alla Neymet's purported signature (as the treating home health aide) for Patient J.D. and Patient E.D.#2. for the period covering on or about August 25, 2009. These time sheets report the following:

39

| Date | Patient's Initials | Times Reported | Pertinent Services Allegedly Rendered |
|------|--------------------|----------------|---------------------------------------|
| 8/25/09 | J.D. | 5:45 a.m.-7:45 a.m. | shower, mouth care, shampoo, dressing, toileting, and assistance with ambulation, among others |
| 8/25/09 | E.D.#1 | 7:45 a.m.-8:45 a.m. | shower, mouth care, shampoo, dressing, toileting, and assistance with ambulation, among others |
| 8/25/09 | J.D. | 5:15 p.m.-8:15 p.m. | shower, dressing, toileting, and assistance with ambulation, among others |

(iv) According to Medicaid records, People Choice was paid approximately $77.50 (Patient J.D.) and $62 (Patient E.D.#2) by Medicaid for alleged home health aide services provided to these patients on this date.

b. Cooperating Witness One also reported that defendant Sonia Mesa purportedly rendered home health aide services, at various times, to two brothers in Bound Brook, New Jersey with the initials J.P. and X.P. (hereinafter "Patient J.P." and "Patient X.P."). These home health aide services, however, were falsely reported as being provided by defendant Leonora Popesku. Thereafter, HHCH and People Choice issued payroll checks to defendant Leonora Popesku, which checks defendant Sonia Mesa endorsed and then negotiated through her own bank account.

(i) On several occasions, including January 5, 11, 12, 15, 19, 21, and 28, 2010, January 5, 11, and 28, 2011, law enforcement officers conducted surveillance of defendant Leonora Popesku. During each surveillance, defendant Leonora Popesku was not observed visiting any known Medicaid eligible patients; rather, she was observed either at her residence or at one of two residences in Westfield, New Jersey, where she

40

provided services, as corroborated through surveillance, to two families as a "nanny."

(ii) As part of this investigation, law enforcement officers have obtained HHCH time sheets for the period covering January 2010, which time sheets bears defendant Leonora Popesku purported signature (as the treating home health aide). In summary, these time sheets report that on approximately 60 occasions in January 2010, defendant Leonora Popesku allegedly provided home health aide services to either Patient J.P. and Patient X.P. In truth and in fact, any home health aide services provided to these patients, if at all, were provided by defendant Sonia Mesa.

(iii) On or about January 12, 2010, law enforcement officers conducted surveillance of defendant Leonora Popesku. In summary, law enforcement officers made the following observations, among others, on that day: (a) at approximately 11:10 a.m., defendant Leonora Popesku arrived at a residence in Westfield, New Jersey where she provides services as a "nanny" to a non-Medicaid eligible family; and (b) defendant Leonora Popesku was observed in or near this residence until 2:48 p.m.

(iv) Contrary to the surveillance conducted on or about January 12, 2010, HHCH time sheets, bearing defendant Leonora Popesku's purported signature and covering the period including January 12, 2010, report that she provided home health aide services to Patient J.P. and Patient X.P. from between 2:30 p.m. to 5:30 p.m.

c. Cooperating Witness One also advised that defendant Nelson Mesa, defendant Sonia Mesa's husband, was a Medicaid recipient who purportedly received home health aide services rendered by defendants Leonora Popesku and Alla Neymet. According to Medicaid records, from in or around January 2007 through in or around April 2012, HHCH billed Medicaid approximately $70,000 for home health aide services allegedly provided to defendant Nelson Mesa. Furthermore, according to those time sheets from HHCH, on various occasions, defendants Leonora Popesku and Alla Neymet are reported as having provided home health aide services to defendant Nelson Mesa:

d. According to Medicaid records, the individuals referred to in Paragraph 51a through 51c are Medicaid eligible patients and are authorized to receive home health aide benefits.

41

52.   On or about February 9, 2011, during a consensually recorded meeting at HHCH, Cooperating Witness One and defendants Irina Krutoyarsky and Nelson Mesa discussed fraudulently obtaining a home health aide certification for a family member and defendant Sonia Mesa's employment with HHCH.   The following conversation ensued, in substance and in part [IK = defendant Irina Krutoyarsky; NM = defendant Nelson Mesa; and CW1 = Cooperating Witness One] [portions of this conversation occurred in Spanish, and Cooperating Witness One acted as a translator]:

NM:   Tell, Tell her that I have a first cousin.

CW1:   [to defendant Irina Krutoyarsky] He has a cousin. He came from Cuba.

NM:   He has, he has all his papers and everything.   He is not working.

CW1:   [to defendant Irina Krutoyarsky] He got all his papers.   He is not working.

NM:   So, I wanted to know if , since she told me one day that if I brought a . . . .

CW1:   [to defendant Irina Krutoyarsky] You told him one day that if he could bring somebody, so, so that Sonya [defendant Sonia Mesa] use . . .

NM:   So that she can work . . . .

CW1:   [to defendant Irina Krutoyarsky] So that Sonya [defendant Sonia Mesa] can work under his name.

IK:   Let him have, you know, license.   We can make a license.

CW1:   You put him through, like if he took the classes?

IK:   Where I'm gonna take your name, you know? . . . . So, I have to put you through classes . . .

NM:   Okay.   I know.

IK:   And then, uh, he gonna do like he work and, uh, Sonya gonna get . . .

NM:   He no, uh, he no working . . . .

42

IK: I don't care, you know.

NK: Well, okay. Yeah.

* * * *

IK: If Alla [defendant Alla Neymet] doesn't want to use her name [for defendant Nelson Mesa's cousin, the prospective HHCH home health aide], then when he gonna, when he gonna have, license, we switch it.

CW1: We'll switch.

IK: You know, I cannot give you names [of "nominee employees"]. I don't know the names, you know.

NM: I understand.

IK: Alla [defendant Alla Neymet] doesn't want, we'll have to get somebody else.  But one thing I'm gonna tell you.  I know she [defendant Sonia Mesa] cannot work so many hours. . . . I know that. Don't tell me this.  It's only 24 hours a day.

CW1: We calculated 130 hours a week.

IK: Okay, you understand?  It's a fraud. . . . It's a fraud.

NM: I understand that.  I just . . .

IK: You don't want her [defendant Sonia Mesa] to be deported.  You don't want her to have a problem.

NM: No, no, no.  I want . . .

IK: You don't understand.

CW1: . . . .Yes, but what she is saying is that Sonia [defendant Sonia Mesa] has too many hours . . . . And that it is impossible for her to work all those hours.

43

## Summary of HHCH and People Choice Payroll Checks

53. According to records obtained from the Mesa Bank
Account, HHCH and People Choice have issued payroll checks
payable to defendants Leonora Popesku and Alla Neymet; however,
these checks were endorsed by defendant Sonia Mesa and then
deposited into the Sonia Mesa Account. The following charts sets
forth some of these checks:

| Date | Payor | Payee | Amount | Endorsements |
|------|-------|-------|--------|--------------|
| 8/7/2009 | HHCH Payroll Account | Leonora Popesku | $759.59 | Leonora Popesku; Sonia Mesa |
| 8/21/2009 | HHCH Payroll Account | Leonora Popesku | $759.59 | Leonora Popesku; Sonia Mesa |
| 8/28/2009 | People Choice Payroll Account | Alla Neymet | $756.18 | Sonia Mesa and Alla Neymet |
| 9/4/2009 | HHCH Payroll Account | Leonora Popesku | $759.59 | Sonia Mesa and Leonora Popesku |
| 9/11/2009 | People Choice Payroll Account | Alla Neymet | $986.97 | Sonia Mesa and Alla Neymet |
| 9/18/2009 | HHCH Payroll Account | Leonora Popesku | $764.26 | Sonia Mesa and Leonora Popesku |
| 10/2/2009 | HHCH Payroll Account | Leonora Popesku | $759.59 | Sonia Mesa and Leonora Popesku |
| 10/16/2009 | HHCH Payroll Account | Leonora Popesku | $725.41 | Leonora Popesku |
| 40115 | HHCH Payroll Account | Leonora Popesku | $759.64 | Leonora Popesku; Sonia Mesa |
| 11/13/2009 | HHCH Payroll Account | Leonora Popesku | $759.59 | Leonora Popesku; Sonia Mesa |
| 11/27/2009 | HHCH Payroll Account | Leonora Popesku | $759.59 | Leonora Popesku; Sonia Mesa |
| 12/11/2009 | HHCH Payroll Account | Leonora Popesku | $789.89 | Leonora Popesku; Sonia Mesa |
| 12/24/2009 | HHCH Operating Account | Leonora Popesku | $100.00 | Leonora Popesku; Sonia Mesa |
| 12/24/2009 | HHCH Payroll Account | Leonora Popesku | $759.64 | Leonora Popesku; Sonia Mesa |
| 1/8/2010 | HHCH Payroll Account | Leonora Popesku | $670.04 | Leonora Popesku; Sonia Mesa |
| 1/22/2010 | HHCH Payroll Account | Leonora Popesku | $567.97 | Leonora Popesku; Sonia Mesa |
| 2/5/2010 | HHCH Payroll Account | Leonora Popesku | $755.02 | Leonora Popesku; Sonia Mesa |
| 2/19/2010 | HHCH Payroll Account | Leonora Popesku | $560.14 | Leonora Popesku; Sonia Mesa |
| 3/5/2010 | HHCH Payroll Account | Leonora Popesku | $474.00 | Leonora Popesku; Sonia Mesa |

44

| Date | Payor | Payee | Amount | Endorsements |
|------|-------|-------|--------|--------------|
| 3/19/2010 | HHCH Payroll Account | Leonora Popesku | $513.14 | Leonora Popesku; Sonia Mesa |
| 4/2/2010 | HHCH Payroll Account | Leonora Popesku | $513.14 | Leonora Popesku; Sonia Mesa |
| 4/16/2010 | HHCH Payroll Account | Leonora Popesku | $513.14 | Leonora Popesku; Sonia Mesa |
| 4/30/2010 | HHCH Payroll Account | Leonora Popesku | $513.14 | Leonora Popesku; Sonia Mesa |
| 5/14/2010 | HHCH Payroll Account | Leonora Popesku | $755.02 | Leonora Popesku; Sonia Mesa |
| 5/28/2010 | HHCH Payroll Account | Leonora Popesku | $669.61 | Leonora Popesku; Sonia Mesa |
| 5/28/2010 | HHCH Payroll Account | Alla Neymet | $336.48 | Alla Neymet; Sonia Mesa |
| 6/11/2010 | HHCH Payroll Account | Leonora Popesku | $615.18 | Leonora Popesku; Sonia Mesa |
| 6/11/2010 | HHCH Payroll Account | Alla Neymet | $675.11 | Alla Neymet; Sonia Mesa |
| 6/25/2010 | HHCH Payroll Account | Leonora Popesku | $591.45 | Leonora Popesku; Sonia Mesa |
| 6/25/2010 | HHCH Payroll Account | Alla Neymet | 653.26 | Alla Neymet; Sonia Mesa |
| 7/9/2010 | HHCH Payroll Account | Leonora Popesku | $591.45 | Leonora Popesku; Sonia Mesa |
| 7/9/2010 | HHCH Payroll Account | Alla Neymet | $653.26 | Alla Neymet; Sonia Mesa |
| 7/23/2010 | HHCH Payroll Account | Leonora Popesku | $591.45 | Leonora Popesku; Sonia Mesa |
| 7/23/2010 | HHCH Payroll Account | Alla Neymet | $662.99 | Alla Neymet; Sonia Mesa |
| 8/6/2010 | HHCH Payroll Account | Leonora Popesku | $566.95 | Leonora Popesku; Sonia Mesa |
| 8/6/2010 | HHCH Payroll Account | Alla Neymet | $627.48 | Alla Neymet; Sonia Mesa |
| 8/20/2010 | HHCH Payroll Account | Leonora Popesku | $566.95 | Leonora Popesku; Sonia Mesa |
| 8/20/2010 | HHCH Payroll Account | Alla Neymet | $627.48 | Alla Neymet; Sonia Mesa |
| 9/3/2010 | HHCH Payroll Account | Leonora Popesku | $566.95 | Leonora Popesku; Sonia Mesa |
| 9/3/2010 | HHCH Payroll Account | Alla Neymet | $627.48 | Alla Neymet; Sonia Mesa |
| 9/17/2010 | HHCH Payroll Account | Leonora Popesku | $572.19 | Leonora Popesku; Sonia Mesa |
| 9/17/2010 | HHCH Payroll Account | Alla Neymet | $608.32 | Alla Neymet; Sonia Mesa |

45

| Date | Payor | Payee | Amount | Endorsements |
|------|-------|-------|--------|--------------|
| 9/24/2010 | People Choice Payroll Account | Leonora Popesku | $250.71 | Leonora Popesku; Sonia Mesa |
| 10/1/2010 | HHCH Payroll Account | Leonora Popesku | $566.95 | Leonora Popesku; Sonia Mesa |
| 10/1/2010 | HHCH Payroll Account | Alla Neymet | $179.60 | Alla Neymet; Sonia Mesa |
| 10/15/2010 | HHCH Payroll Account | Leonora Popesku | $566.95 | Leonora Popesku; Sonia Mesa |
| 10/15/2010 | HHCH Payroll Account | Alla Neymet | $179.60 | Alla Neymet; Sonia Mesa |
| 10/22/2010 | People Choice Payroll Account | Leonora Popesku | $310.57 | Leonora Popesku; Sonia Mesa |
| 10/22/2010 | People Choice Payroll Account | Alla Neymet | $162.22 | Alla Neymet; Sonia Mesa |
| 10/29/2010 | HHCH Payroll Account | Leonora Popesku | $566.95 | Leonora Popesku; Sonia Mesa |
| 10/29/2010 | HHCH Payroll Account | Alla Neymet | $179.60 | Alla Neymet; Sonia Mesa |
| 11/5/2010 | People Choice Payroll Account | Leonora Popesku | $417.35 | Leonora Popesku; Sonia Mesa |
| 11/12/2010 | HHCH Payroll Account | Leonora Popesku | $566.95 | Leonora Popesku; Sonia Mesa |
| 11/12/2010 | HHCH Payroll Account | Alla Neymet | $515.74 | Alla Neymet; Sonia Mesa |
| 11/19/2010 | People Choice Payroll Account | Leonora Popesku | $417.35 | Leonora Popesku; Sonia Mesa |
| 11/19/2010 | People Choice Payroll Account | Alla Neymet | $357.11 | Alla Neymet; Sonia Mesa |
| 11/26/2010 | HHCH Payroll Account | Leonora Popesku | $507.12 | Leonora Popesku; Sonia Mesa |
| 11/26/2010 | HHCH Payroll Account | Alla Neymet | $547.68 | Alla Neymet; Sonia Mesa |
| 12/3/2010 | People Choice Payroll Account | Leonora Popesku | $420.34 | Leonora Popesku; Sonia Mesa |
| 12/3/2010 | People Choice Payroll Account | Alla Neymet | $392.22 | Alla Neymet; Sonia Mesa |
| 12/10/2010 | HHCH Payroll Account | Leonora Popesku | $572.19 | Leonora Popesku; Sonia Mesa |
| 12/10/2010 | HHCH Payroll Account | Alla Neymet | $495.78 | Alla Neymet; Sonia Mesa |
| 12/17/2010 | People Choice Payroll Account | Leonora Popesku | $419.59 | Leonora Popesku; Sonia Mesa |
| 12/17/2010 | People Choice Payroll Account | Alla Neymet | $389.03 | Alla Neymet; Sonia Mesa |
| 12/24/2010 | HHCH Payroll Account | Leonora Popesku | $566.95 | Leonora Popesku; Sonia Mesa |

| Date | Payor | Payee | Amount | Endorsements |
|------|-------|-------|--------|--------------|
| 12/24/2010 | HHCH Payroll Account | Alla Neymet | $547.68 | Alla Neymet; Sonia Mesa |
| 12/31/2010 | People Choice Payroll Account | Leonora Popesku | $419.59 | Leonora Popesku; Sonia Mesa |
| 12/31/2010 | People Choice Payroll Account | Alla Neymet | $341.15 | Alla Neymet; Sonia Mesa |
| 1/14/2011 | People Choice Payroll Account | Leonora Popesku | $415.09 | Leonora Popesku; Sonia Mesa |
| 1/7/2011 | HHCH Payroll Account | Alla Neymet | $474.43 | Alla Neymet; Sonia Mesa |
| 1/7/2011 | HHCH Payroll Account | Leonora Popesku | $552.51 | Leonora Popesku; Sonia Mesa |
| 1/14/2011 | People Choice Payroll Account | Leonora Popesku | $415.09 | Leonora Popesku; Sonia Mesa |
| 1/14/2011 | People Choice Payroll Account | Alla Neymet | $202.69 | Alla Neymet; Sonia Mesa |
| 1/21/2011 | HHCH Payroll Account | Alla Neymet | $491.76 | Alla Neymet; Sonia Mesa |
| 1/21/2011 | HHCH Payroll Account | Leonora Popesku | $580.51 | Leonora Popesku; Sonia Mesa |
| 1/28/11 | People Choice Payroll Account | Leonora Popesku | $412.79 | Leonora Popesku; Sonia Mesa |
| 2/4/2011 | HHCH Payroll Account | Alla Neymet | $537.95 | Alla Neymet; Sonia Mesa |
| 2/4/2011 | HHCH Payroll Account | Leonora Popesku | $566.51 | Leonora Popesku; Sonia Mesa |
| 2/11/2011 | People Choice Payroll Account | Leonora Popesku | $412.79 | Leonora Popesku; Sonia Mesa |
| 2/18/2011 | HHCH Operating Account | Alla Neymet | $100.00 | Alla Neymet; Sonia Mesa |
| 2/18/2011 | HHCH Payroll Account | Leonora Popesku | $566.51 | Leonora Popesku; Sonia Mesa |
| 2/18/2011 | HHCH Payroll Account | Alla Neymet | $488.82 | Alla Neymet; Sonia Mesa |
| 2/25/2011 | People Choice Payroll Account | Leonora Popesku | $412.79 | Leonora Popesku; Sonia Mesa |
| 3/4/2011 | HHCH Payroll Account | Leonora Popesku | $566.51 | Leonora Popesku; Sonia Mesa |
| 3/4/2011 | HHCH Payroll Account | Alla Neymet | $415.14 | Alla Neymet; Sonia Mesa |
| 3/11/2011 | People Choice Payroll Account | Leonora Popesku | $412.79 | Leonora Popesku; Sonia Mesa |
| 3/18/2011 | HHCH Payroll Account | Leonora Popesku | $566.51 | Leonora Popesku; Sonia Mesa |
| 3/18/2011 | HHCH Payroll Account | Alla Neymet | $537.95 | Alla Neymet; Sonia Mesa |

| Date | Payor | Payee | Amount | Endorsements |
|------|-------|-------|--------|--------------|
| 3/25/2011 | People Choice Payroll Account | Leonora Popesku | $412.79 | Leonora Popesku; Sonia Mesa |
| 4/1/2011 | HHCH Payroll Account | Leonora Popesku | $566.51 | Leonora Popesku; Sonia Mesa |
| 4/1/2011 | HHCH Payroll Account | Alla Neymet | $480.64 | Alla Neymet; Sonia Mesa |
| 4/8/2011 | People Choice Payroll Account | Leonora Popesku | $412.79 | Leonora Popesku; Sonia Mesa |
| 4/15/2011 | HHCH Payroll Account | Leonora Popesku | $566.51 | Leonora Popesku; Sonia Mesa |
| 4/15/2011 | HHCH Payroll Account | Alla Neymet | $480.64 | Alla Neymet; Sonia Mesa |
| 4/22/2011 | People Choice Payroll Account | Leonora Popesku | $412.79 | Leonora Popesku; Sonia Mesa |
| 4/29/2011 | HHCH Payroll Account | Leonora Popesku | $566.51 | Leonora Popesku; Sonia Mesa |
| 4/29/2011 | HHCH Payroll Account | Alla Neymet | $423.33 | Alla Neymet; Sonia Mesa |
| 5/6/2011 | People Choice Payroll Account | Leonora Popesku | $481.96 | Leonora Popesku; Sonia Mesa |
| 5/12/2011 | HHCH Payroll Account | Leonora Popesku | $566.51 | Leonora Popesku; Sonia Mesa |
| 5/12/2011 | HHCH Payroll Account | Alla Neymet | $183.72 | Alla Neymet; Sonia Mesa |
| 5/20/2011 | People Choice Payroll Account | Leonora Popesku | $643.23 | Leonora Popesku; Sonia Mesa |
| 5/27/2011 | HHCH Payroll Account | Leonora Popesku | $566.51 | Leonora Popesku; Sonia Mesa |
| 5/27/2011 | HHCH Payroll Account | Alla Neymet | $316.90 | Alla Neymet; Sonia Mesa |
| 6/3/2011 | People Choice Payroll Account | Leonora Popesku | $643.23 | Leonora Popesku; Sonia Mesa |

54. Wage Records:

a. Defendant Sonia Mesa. According to records from the New Jersey Department of Labor, defendant Sonia Mesa is neither reported as an employee of HHCH nor People Choice nor reported as receiving any wages from these companies.

b. Defendant Alla Neymet. According to records from the New Jersey Department of Labor, defendant Alla Neymet has received wages from HHCH from in or around 2007 through in or around the third quarter of 2012, as follows (all approximate): $50 (2007); $12,600 (2008); $600 (2009); $9,100 (2010); $13,300 (2011); and $13,300 (through third quarter 2012). According to records from the New Jersey Department of Labor, defendant Alla Neymet has received wages from People Choice from in or around 2007 through in or around the third quarter of 2012, as follows (all approximate): $20,700 (2007); $0 (2008); $27,900 (2009); $16,100 (2010); $220 (2011); and $0 (through third quarter 2012).

c. According to records from the New Jersey Department of Labor, defendant Leonora Popesku has received wages from HHCH from in or around 2007 through in or around the third quarter of 2012, as follows (all approximate): $15,200 (2007); $23,900 (2008); $23,900 (2009); $18,100 (2010); $18,200 (2011); and $13,900 (through third quarter 2012).

## The Bribery Scheme

55. On or about April 29, 2010, the New Jersey Department of Labor served defendant Irina Krutoyarsky with a state-issued written demand for HHCH's records related to HHCH's employees wage and hour records (hereinafter the "First Demand Letter"). According to Cooperating Witness One, after the First Demand Letter was issued, it caused extensive commotion at HHCH's office because defendant Irina Krutoyarsky and her co-conspirators knew that compliance with the First Demand Letter would expose the Medicaid scheme. According to Cooperating Witness One, initially defendant Irina Krutoyarsky planned to falsify HHCH's home health aides' time sheets. Defendant Irina Krutoyarsky, however, scrapped this plan in favor of attempting to bribe the employee from the New Jersey Department of Labor, who was conducting the

investigation, for the purpose of corruptly terminating the state's investigation.

56.   On or about May 5, 2010, Cooperating Witness Two visited HHCH and met with defendant Irina Krutoyarsky.   During this consensually recorded meeting, Cooperating Witness Two stated that HHCH would be required to turn over the records sought in the First Demand Letter.

57.   On or about June 3, 2010, Cooperating Witness Two met defendant Irina Krutoyarsky inside her office at HHCH to discuss the production of documents required by the First Demand Letter. During this consensually recorded meeting, the following conversation ensued, in substance and in part [IK = defendant Krutoyarsky and CW2 = Cooperating Witness Two]:

> CW2: Listen.  So, so what are you saying?  What do you
>       wanna do?  You don't wanna make these copies for
>       me?
>
> IK:   I want to, I make every, I make for you but it's
>       crazy.  I make for you a 10, 11 weeks or a 10, 11
>       patient now. . . . You know how much manpower, I
>       have to get here?
>
>                     * * * *
>
> IK:   I just gonna make sure everybody happy, and I'm
>       telling you, I never said this.
>
> CW2: Yeah, but see once she [the complainant] makes a
>       complaint. . . .
>
> IK:   I will talk to her.
>
> CW2: And I've already been here twice. . . .but, and,
>       and then we may have to go.  I don't know how I'm
>       gonna get out of it [terminating the
>       investigation] unless, you know.
>
> IK:   I will.

CW2: I gotta make it worth my while like to, so that he [Cooperating Witness Two's supervisor] don't . . . .

IK: I'll take care of it. . . . Just tell me what I have to do this one, I know what to do.  She's, just call her.

CW2: Uh-hmm. . . . Well, I can't deal with her [the employee who made the complaint].

IK: I, I do it. . . . Not your job. . . .  I do everything.

* * * *

IK: You know what?  You, I can not tell you what to do, but you can say, you check the records, they all correct. . . .

CW2: Yeah, but I just, you know, I just can't walk away. . . . I know, but I just can't walk away.

IK: Okay, do whatever you have to do.  Tell me how to get out, what you can do.  I'll work with you whatever you say will be done.  You don't even have to blink, you know, it's gonna be done whatever you say.

CW2: You got a number I can call you that's not here?

IK: Ah, you can call me to my cell phone number and, you know, and we not gonna talk on the phone.  I can meet. . . . You gonna be happy, it's not gonna be paper trail.

* * * *

IK: I will go and meet you any place you tell me, or the parking lot, or truck stop.  You know, any place you want, do whatever has to be done, and, you know, tell.  I would, if you tell me. I will

51

call her [the employee who made the complaint] and approach her from this end.

CW2: Well, you would have to do that first.

IK: I will, I will do this first.

* * * *

IK: I don't wanna go because you know how much it's gonna cost me?

CW2: [Interjects] Yeah, but you know what. . . . Do, do you know what I gotta do to hide that?

IK: I, it's gonna be well, well, very worth it.

CW2: Alright, let me think about it. I don't wanna, I don't wanna.

IK: Listen, I have ah, you know, it's gonna be done with me and nobody else. . . . And it's gonna be no paper trace, no nothing. You know, shake hands, do it, and done.

* * * *

IK: We will come to an agreement no matter what but I have to settle this when I do.

CW2: Before June 16th cause it, cause it . . . . okay? . . . . Cause I gotta keep my ass out of trouble.

IK: But I don't want you to be in trouble. I don't wanna get myself in trouble that's why I'm saying to you. I don't talk.

52

58. On or about June 14, 2010, Cooperating Witness Two met defendant Irina Krutoyarsky at HHCH. During this consensually recorded meeting (audio and video), defendant Irina Krutoyarsky entered Cooperating Witness Two's car, where they were alone. After entering the car, defendant Irina Krutoyarsky gave Cooperating Witness Two an envelope containing $1,000 in cash. Thereafter, the following conversation ensued, in substance and in part:

IK: I want you to check it [the envelope] and see if it's, everything in order. If it's everything in order, you know that's good. If it's, you know, everything. .

CW2: What ah, what? [Counting money].

IK: Um, it's um, I give you, it's on the paper. I know, I got it. I get it. I, you know, ah, if it's everything in order, but it's okay. If it's not in order let me know what we missing.

CW2: Ahh.

IK: Tell me what we be missing.

AC: Well, I, I can't, you know.

IK: Tell me what we're missing? You understand what I'm saying?

CW2: [Laughs] You want me to tell you?

IK: Yes.

CW2: You bribing me to, to make this go away?

IK: No, I'm not bribing you to, to, to go away.

CW2: Well, you want me to write a number down?

IK: I, I want you to see if everything missing that on that.

* * * *

IK:  That's yours [referring to the envelope containing $1,000 in cash].

CW2: But , I'm risking a lot.

IK:  You know, it's a very scary position.  I just want you to write down whatever is missing. . .

CW2: Well, [Counts] one, two, three, that's what there?

IK:  Yes.  So it's okay, okay.  If it's not okay tell me what would be okay, you know.

CW2: Do you realize the possibilities of what's going on here?  With these records, I have to show that I did something.  I need some. . . . No, I need some records. . . .

* * * *

CW2: Okay, my plan is, is to, I have to make it look like I'm working, like I'm doing something that I did the investigation.  So I'm gonna sit on my desk.  My boss sees me going through all of these cause he's already asked me twice, what's going on?  It's taking too long.  Ah, if I don't produce 'em, you looking at a lot of money in fines.

IK:  I don't have much to. . . .

* * * *

IK:  Tell me what is gonna make this go-away?  That's what I wanna tell you. . . . I need your help, tell me what it is. . . .

Thereafter, defendant Irina Krutoyarsky began negotiating the amount of the bribe by passing written notes to Cooperating Witness Two.  The following conversation then ensued, in substance and in part:

54

> IK: You know, and let me . . . know what it is and I
> gonna tear off. This is, I would give it to you,
> all of them [HHCH's records from January to May
> 2010].
>
> CW2: Alright. I need, and, and, and again, I had this
> all planned in my head but I thought we were gonna
> talk before. . . . . Ah, the one-thousand.
>
> IK: I don't wanna talk about it, tell me what it is. .
> . .
>
> CW2: See there's a lot of. . . . . I'm risking a lot.

Cooperating Witness Two wrote "$20,000" on the piece of paper.
Defendant Irina Krutoyarsky then wrote, "10,000" on the piece of
paper. Cooperating Witness Two replied, "What's that?" The
following conversation then ensued:

> IK: Cash.
>
> CW2: Cash?
>
> IK: I, I, I don't have it. I mean, I, I can not
> afford that.
>
> CW2: [Sighs] Do you realize what happens if I get
> caught. . . .
>
> IK: You take this.
>
> CW2: Uh-huh.

Based on the above conversation, including the communications
conducted by passing notes, defendant Irina Krutoyarsky agreed to
pay Cooperating Witness Two approximately $10,000 to end the
State Department of Labor's investigation into HHCH. Thereafter,
in Cooperating Witness Two's presence and audible on the
recording, defendant Irina Krutoyarsky ripped the note into
several pieces. Defendant Irina Krutoyarsky also agreed to give
Cooperating Witness Two certain HHCH records. According to
Cooperating Witness Two, he represented to defendant Irina

Krutoyarsky that he needed some HHCH records to appease his supervisor. Special Agents of the Federal Bureau of Investigation were conducting surveillance of this meeting nearby.

59. Immediately after this meeting on or about June 14, 2010, Cooperating Witness Two provided Special Agents from the Federal Bureau of Investigation the envelope containing the $1,000 cash provided by defendant Irina Krutoyarsky to Cooperating Witness Two and the ripped pieces of paper they used to negotiate the bribe. These items were retained as evidence.

60. On or about June 21, 2010, Cooperating Witness Two called defendant Irina Krutoyarsky. During this consensually recorded phone call, Cooperating Witness Two asked her if she had the money, referring to the previously negotiated $10,000 bribe. Defendant Irina Krutoyarsky responded that she did not know what Cooperating Witness Two was talking about. Later that day, during a consensually recorded (audio and video) face-to-face meeting between defendant Irina Krutoyarsky and Cooperating Witness Two inside her office in HHCH, based on the prior phone call, Cooperating Witness Two asked defendant Irina Krutoyarsky, "Ah, our agreement for the other day is dead?" She replied, "No, everything's staying okay, everything is okay." Defendant Irina Krutoyarsky, directed, without speaking, Cooperating Witness Two to a large box inside of her office. Cooperating Witness Two then opened the box and retrieved an envelope inside the box, which envelope contained $10,000 (100 $100 bills) in cash. This box also contained the HHCH times sheets from January to May 2010. Thereafter, the following conversation ensued, in substance and in part [IK = defendant Irina Krutoyarsky and CW2 = Cooperating Witness Two]:

> IK: [Talking with an employee] I don't wanna be disturbed for 15 minutes, nobody to talk to me please. No, no telephone please.

> CW2: How much you think it's worth? That's the 10,000? And, you are a woman of your word.

> IK: A hundred percent.

Immediately after the meeting, Cooperating Witness Two gave the
$10,000 cash to a Special Agent from the Federal Bureau of
Investigation and this cash was retained as evidence.

61. On or about April 14, 2011, defendant Irina Krutoyarsky
and Cooperating Witness Two spoke on the telephone. During this
consensually recorded phone call, defendant Irina Krutoyarsky
stated that People Choice (defendant Paul Mil's company) had
received a demand letter (hereinafter "Second Demand Letter")
from the New Jersey Department of Labor. Defendant Irina
Krutoyarsky stated, in substance and in part, "[T]his letter from
[from the New Jersey Department of Labor] [was served] not on my
business . . . you know, family member business, same one. It's
called People Choice Home Care and . . . maybe you can check it
out, maybe somebody did a complaint and maybe even help me out,
maybe you can take this case?" Later during the conversation,
defendant Irina Krutoyarsky stated that the business, People
Choice, was her "brother's business . . . . family, you know . .
. . I, I take care of everything." When Cooperating Witness Two
asked about the business, defendant Irina Krutoyarsky noted that
it was a "home care agency . . . . same thing as mine but three
times smaller." Thereafter, defendant Irina Krutoyarsky again
inquired about the identity of the complainant, stating, "Find
out the name and everything else and maybe I can get the paper
[the complaint] from them to close everything."

62. On or about April 20, 2011, Cooperating Witness Two met
defendant Irina Krutoyarsky inside her office at HHCH. According
to Cooperating Witness Two, defendant Irina Krutoyarsky asked
Cooperating Witness Two about the New Jersey Department of
Labor's investigation into People Choice. According to
Cooperating Witness Two, he advised defendant Irina Krutoyarsky
that the investigation into People Choice concerned the company's
failure to pay overtime to its employees. Furthermore, according
to Cooperating Witness Two, defendant Irina Krutoyarsky asked if
Cooperating Witness Two could have the investigation reassigned
to him and then "make it go away," or words to that effect. In
addition, defendant Irina Krutoyarsky again asked about the
identity of the complainant. Later during the conversation,
according to Cooperating Witness Two, defendant Paul Mil entered
the office and was introduced by defendant Irina Krutoyarsky as
her brother. Thereafter, according to Cooperating Witness Two,

57

defendant Paul Mil asked "Are you going to take care of me?," or
words to that effect, and Cooperating Witness Two replied that if
defendant Irina Krutoyarsky takes care of him, he would take care
of defendant Paul Mil. According to Cooperating Witness Two,
defendant Paul Mil responded that defendant Irina Krutoyarsky
would take care of Cooperating Witness Two.

63. On or about May 4, 2011, Cooperating Witness Two met
defendant Irina Krutoyarsky inside her office at HHCH. During
this consensually recorded meeting (audio and video), defendant
Irina Krutoyarsky negotiated a bribe payment with Cooperating
Witness Two related to the People Choice investigation. During
this meeting, defendant Irina Krutoyarsky offered to pay
Cooperating Witness Two approximately $15,000 to subvert the New
Jersey Department of Labor's investigation into People Choice.
According to Cooperating Witness Two and as revealed by the
consensually recorded video of the meeting, defendant Irina
Krutoyarsky attempted to communicate with Cooperating Witness Two
concerning the amount of the bribe by writing amounts on the back
of an envelope and then showing the notations to Cooperating
Witness Two (hereinafter the "Envelope"). The following
conversation ensued, in substance and in part [IK = defendant
Irina Krutoyarsky and CW2 = Cooperating Witness Two]:

> CW2: If you want me to take it, it's like I told you
> before, we gotta' make a deal. What do you wanna'
> do?
>
> IK: I want to do it, but tell me, I don't know if I
> can afford it. [Laughing].
>
> CW2: You gotta' make it worth my while. . . .
>
> IK: Do it for eleven [whispering]. That's a lot of
> money.
>
> CW2: I'm gonna need more than that.
>
> IK: [Whispering] Cash. Cash.
>
> CW2: I'm not. . . .

IK:  [Whispering]  It's cash.  [Thereafter, as revealed
     by the consensual video recording, defendant Irina
     Krutoyarsky retrieved the Envelope from her desk
     drawer, wrote on the Envelope, and then placed the
     Envelope on the desk between herself and
     Cooperating Witness Two]:

CW2: [Laughing]  What are you doing writing?  Don't you
     trust me yet?

IK:  Yes I do.  Don't you trust me yet?

CW2: Yeah!  . . . . I'm risking a lot here.

IK:  And me?

                    *  *  *  *

CW2: Right.  And that's, that's, remember what I told
     ya', it's pretty steep penalties.

IK:  Okay.

CW2: I want thirty.

IK:  You crazy?

CW2: Yeah.

IK:  I cannot do it.  [Chuckles].  I cannot do it.

CW2: Okay.  Hey, I'm not gonna'. . . .

IK:  I cannot. . . . I cannot do it.  I mean, you can
     kill me, I cannot do it [placing her hands on her
     heart].

CW2: Make me an offer.

IK:  [Sighs, picks up a pen, and writes on the
     Envelope].  Maybe eleven, okay I put in another
     two, you know [circling an amount on the

                         59

Envelope].  But it's a lot of money.  Cash.  [see Paragraph 64 below].

CW2: That's a lot of risk I'm taking.

IK: [Y]ou know that, you know, that is what I can do.

CW2: Well, think about it . . . .

IK: Please [Picks up a pen and circles and underlines something on the Envelope][see Paragraph 64 below].

CW2: It's gotta' be more than that.

\* \* \* \*

IK: Take the case.  Take the case.  And I will give it to you.  I have to make sure you come back, you know?

CW2: From where?

IK: Paul [defendant Paul Mil].  You're going to Paul. I wanna' make sure you take the case.

\* \* \* \*

CW2: You're, you're gonna' pay me.  Not him.

IK: No, no, he [defendant Paul Mil] doesn't know anything.  I'll take care. . . . This is my daughter's neck, you know.

CW2: For fifteen [$15,000].

IK: Fifteen.  I, I, you'll kill me.  I cannot do it. It's too much for me. . . . Okay, here [ripping the Envelope and places it in a trash receptacle in her office].

60

64.  On or about May 5, 2011, law enforcement officers recovered bags of trash located on the curb in front of the HHCH building.  Thereafter, law enforcement officers recovered, among other things, pieces of the Envelope.  Law enforcement officers then reconstructed the Envelope, which shows the following:

"cash" [underlined]

"11 + 2" [circled]

"15" [circled]

65.  On or about May 17, 2011, Cooperating Witness Two met defendant Irina Krutoyarsky inside her office at HHCH. During this consensually recorded meeting (audio and video), Cooperating Witness Two asked defendant Irina Krutoyarsky if she had anything for him/her, and defendant Irina Krutoyarsky then placed a small cardboard box used to hold business cards in front of Cooperating Witness Two.  After defendant Irina Krutoyarsky placed the box in front of Cooperating Witness Two, defendant Irina Krutoyarsky gestured to the box and stated, "that's all here," or words to that effect.  Cooperating Witness Two asked, "The whole fifteen?," and Krutoyarsky stated, "yeah."  Then, Cooperating Witness Two stated, "What'd you do, raid the piggy bank?" Defendant Irina Krutoyarsky smiled, as captured by the consensual video recording.  After this meeting with defendant Irina Krutoyarsky, Cooperating Witness Two provided approximately $15,000 in cash to law enforcement officers, which cash was taken into evidence.

## The Scheme to Launder Proceeds of the Medicaid Scheme and to Unlawfully Structure Financial Transactions

### The Money Laundering Scheme

66.   After defendants Irina Krutoyarsky, Paul Mil, and their co-conspirators defrauded Medicaid, as described above, proceeds of the health care fraud were transmitted into the HHCH Payroll Account, HHCH Operating Account, People Choice Payroll Account, and the People Choice Operating Account, among other accounts. Thereafter, defendants Irina Krutoyarsky, Paul Mil, and their co-conspirators conducted financial transactions with the proceeds of the Medicaid fraud to conceal the scheme, disguise the source of the illegal proceeds, and allow the scheme to continue.   In addition, the investigation has revealed that defendants Irina Krutoyarsky, Gulmira Shayakhmetova, and their co-conspirators have unlawfully structured financial transactions to evade the currency reporting requirements, as described below.

67.   For example, defendant Irina Krutoyarsky controlled approximately ten checking accounts in the names of other individuals (hereinafter the "Nominee Accounts").   The vast majority of these Nominee Accounts were maintained at a bank near HHCH (hereinafter "Bank One").   Defendant Irina Krutoyarsky funded the vast majority of these Nominee Accounts with HHCH payroll checks, which checks represented the proceeds of the Medicaid fraud.   Thereafter, defendant Irina Krutoyarsky issued, and caused to be issued, checks from these Nominee Accounts to pay the mortgage on her residential home in Springfield, New Jersey; to pay taxes and condominium fees for several properties in Florida; to pay for other personal expenses; and to give money to other HHCH employees.

68.   According to Cooperating Witness One, he/she has observed, on multiple occasion, checkbooks on defendant Irina Krutoyarsky's desk.   These checkbooks, according to Cooperating Witness One, were in the names of individuals other than defendant Irina Krutoyarsky.   Cooperating Witness One has also observed defendant Irina Krutoyarsky writing on these checks and forging the signatures of the payors.   In particular, Cooperating Witness One reported that defendant Irina Krutoyarsky possessed and used a checkbook issued to a person with the initials "N.L."

(hereinafter the "N.L. Account").  On one occasion in May 2010, defendant Irina Krutoyarsky issued Cooperating Witness One a check, drawn on the N.L. Account.  Cooperating Witness One observed defendant Irina Krutoyarsky sign N.L.'s name on the check.  Copies of this check, obtained both from Cooperating Witness One and the bank, were retained as evidence.

     69.  On or about April 5, 2012, Cooperating Witness Three met defendants Irina Krutoyarsky and Paul Mil at HHCH.  During this consensually recorded conversation (audio and video), defendant Irina Krutoyarsky and Cooperating Witness Three discussed establishing a nominee account [IK = defendant Irina Krutoyarsky; PM = defendant Paul Mil; and CW3 = Cooperating Witness Three]:

> IK: Maybe it's a good idea to go across the street to the bank [Bank One].  Open account there. . . .

> CW3: Oh, okay.

> IK: I gonna deposit checks and I give them the personal check.  You understand? . . . . Because they cannot cash the check on your name [a reference to paying an illegal alien or uncertified worker].

> CW3: That's true.

> IK: You know?  You give me this account to me.

> CW3: Uh, huh

> IK: *And I manage this account.  You're not gonna touch the money there.* (emphasis added).

> CW3: Oh, okay.

> IK: And you know, and once a month, or once in a two months I maybe gonna say, call and say, come in I need maybe 2,000, 3,000.  You get the check.  You understand?

CW3: Oh, okay

IK: Because this bank across the street is very comfortable.

CW3: Oh, okay.

70. On or about May 17, 2012, Cooperating Witness Three met defendants Irina Krutoyarsky and Paul Mil at HHCH [portions of this conversation are set forth in Paragraph 14 above]. During this consensually recorded meeting, defendant Irina Krutoyarsky again discussed establishing a nominee account with Cooperating Witness Three's assistance. The following conversation ensued, in substance and in part [IK = defendant Irina Krutoyarsky; PM = defendant Paul Mil; and CW3 = Cooperating Witness Three]:

IK: . . . . So what I need from you, I need to open an account there.

CW3: Oh, okay.

IK: Remember I started. . . .

CW3: [Interjects] you know, [Bank One], yeah.

IK: Bank One?

CW3: Uh-huh.

IK: Bring me the checkbook because I would need the checkbook. I gonna use this account. I gonna put in money there, and I gonna give them the checks from same account. You, you understand what I'm saying?

CW3: Oh, okay.

IK: If somebody work on your license [works as a home health aide under the home health aide certification], okay, that benefit you a lot because it's giving social security. They pay your social security.

64

* * * *

IK:    [Interjects] Okay listen.

PM:    ex, explain because. . . .

CW3:   But do I make any money or no?

IK:    You make your social security. It pays. . . .
       your benefits.

PM:    If you need it.

IK:    You don't make any money.

71.    Defendant Irina Krutoyarsky conducted numerous
financial transactions through the HHCH Operating Account, the
HHCH Payroll Account, and the Nominee Accounts, including the
N.L. Account, which accounts defendant Irina Krutoyarsky
controlled. These accounts and others, containing proceeds
traceable to the Medicaid fraud scheme alleged in Count of this
Criminal Complaint, were used to maintain, pay for, and otherwise
satisfy obligations related to ownership of the real property set
forth in detail in the Forfeiture Allegation, Paragraph 2a
through 2n. Examples of traceable proceeds include, but are not
limited to, the following:

        a.    23680 Walden Center Drive, #108, Bonita Springs,
Florida. On or about January 8, 2010, defendant Irina
Krutoyarsky issued, or caused to be issued, a check, totaling
approximately $1,228 and drawn on the N.L. Account, to The Tides
at Pelican Landing, in Bonita Springs, Florida for the real
property located at 23680 Walden Center Drive, #108, Bonita
Springs, Florida. Defendant Irina Krutoyarsky owns or has an
interest in a condominium located at this address.

        b.    23540 Walden Center Drive, #210, Bonita Springs,
Florida. Your Affiant's investigation has determined that
numerous checks, issued from the HHCH Payroll Account, were
deposited into an account in the name of an individual with the
initials E.B. (hereinafter the "E.B. Account"), another nominee
account. For example, from in or around January 2010 through on

65

or about March 25, 2010, defendant Irina Krutoyarsky deposited, or caused to be deposited, approximately $11,272, into the E.B. Account. Thereafter, on or about March 25, 2010, defendant Irina Krutoyarsky, issued, or caused to be issued, a check, totaling approximately $1,264 and drawn on the E.B. Account, to The Tides at Pelican Landing, Bonita Springs, Florida for the real property located at 23540 Walden Center Drive, #210, Bonita Springs, Florida. Defendant Irina Krutoyarsky owns or has an interest in a condominium located at this address.

c.    220 South Riverwalk Drive, Palm Coast, Florida. On or about August 17, 2009, approximately four HHCH payroll checks, totaling approximately $2,084, were deposited into the N.L. Account. On or about October 1, 2009, defendant Irina Krutoyarsky issued, or caused to be issued, a check, totaling approximately $472.96 and drawn on the N.L. Account, to Palm Coast Plantation for the real property located 220 South Riverwalk Drive, Palm Coast, Florida. Defendant Irina Krutoyarsky owns or has an interest in real property located at this address. Furthermore, on or about November 21, 2009, defendant Irina Krutoyarsky issued, or caused to be issued, a check, totaling approximately $493 and drawn on the E.B. Account, to Flagler County Tax Collector for the real property located at 220 South Riverwalk Drive, Palm Coast, Florida. Defendant Irina Krutoyarsky signed this check drawn on the E.B. Account.

d.    89 Island Estates Parkway, Palm Coast, Florida. On or about January 27, 2010, approximately four HHCH payroll checks, totaling approximately $1,385, were deposited into the N.L. Account. On or about January 29, 2010, defendant Irina Krutoyarsky issued, or caused to be issued, a check, totaling approximately $74 and drawn on the N.L. Account, to Island States HOA for the real property located 89 Island Estates Parkway, Palm Coast, Florida. Defendant Irina Krutoyarsky owns or has an interest in real property located at this address.

e.    128 Hidden Palms Drive, 3-102, Ponte Vedra Beach, Florida. From in or around June 2009 through in or around August 2009, approximately thirteen HHCH payroll checks, totaling approximately $7,289, were deposited into the N.L. Account. On or about October 1, 2009, defendant Irina Krutoyarsky issued, or caused to be issued, a check, totaling approximately $1,500 and

drawn on the N.L. Account, to Portofino at Ponte Vedra, Ponte Vedra Beach, Florida for the real property located at 128 Hidden Palms Drive, 3-102, Ponte Vedra Beach, Florida. Defendant Irina Krutoyarsky owns or has an interest in a condominium located at this address. On or about December 12, 2009, approximately eleven HHCH payroll checks, totaling approximately $4,110, were deposited into the N.L. Account. On or about December 15, 2009, approximately five HHCH payroll checks, totaling approximately $2,248, were deposited into the N.L. Account. On or about December 22, 2009, defendant Irina Krutoyarsky issued, or caused to be issued, a check, totaling approximately $4,078 and drawn on the N.L. Account, to St. Johns County Tax Collector, St. Johns Florida for the real property located at 128 Hidden Palms Drive, 3-102, Ponte Vedra Beach, Florida.

f.    106 Central Park South, Unit 14C, New York, New York. On or about September 19, 2009, defendant Irina Krutoyarsky issued, or caused to be issued, a check, totaling approximately $677 and drawn on the E.B. Account, to NYC Departments of Finance for the real property located at 106 Central Park South, Unit 14C, New York, New York. Defendant Irina Krutoyarsky owns or has an interest in a condominium at this address.

g.    10 Outlook Way, Springfield, New Jersey. From on or about August 1, 2009 through on or about August 2, 2009, approximately eight HHCH payroll checks, totaling approximately $4,300, were deposited into the E.B. Account. On or about October 3, 2009, defendant Irina Krutoyarsky issued, or caused to be issued, a check, totaling approximately $3,876 and drawn on the E.B. Account, to BAC Home Loan Servicing LP for the real property located at 10 Outlook Way, Springfield, New Jersey. Defendant Irina Krutoyarsky owns or has an interest in the residence located at this address.

h.    503 & 505 Richmond Avenue, Lehigh Acres, Florida. From on or about November 24, 2010 through on or about December 1, 2010, approximately seven HHCH payroll checks, totaling approximately $3,106, were deposited into the N.L. Account. On or about December 1, 2010, defendant Irina Krutoyarsky issued, or caused to be issued, a check, totaling approximately $127 and drawn on the N.L. Account, to the Lee County Tax Collector, Lee

67

County, Florida for the parcels of real property located at 503 &
505 Richmond Avenue, Lehigh Acres, Florida.  Defendant Irina
Krutoyarsky owns or has an interest in each parcel of real estate
located at these addresses.

   i. 1323 Maple Avenue North, Lehigh Acres, Florida.
Your Affiant's investigation has determined that numerous checks,
issued from the HHCH Payroll Account, were deposited into an
account in the name of an individual with the initials A.P.
(hereinafter the "A.P. Account"), another nominee account.  For
example, from in or around October 2009 through on or about
November 19, 2009, defendant Irina Krutoyarsky deposited, or
caused to be deposited, approximately $9,476 (representing
approximately sixteen checks) into the A.P. Account.  Thereafter,
on or about December 7, 2009, defendant Irina Krutoyarsky,
issued, or caused to be issued, a check, totaling approximately
$141 and drawn on the A.P. Account, to the Lee County Tax
Collector, Lee County, Florida for the parcel of land located at
1323 Maple Avenue North, Lehigh Acres, Florida.  Defendant Irina
Krutoyarsky owns or has an interest in a parcel of real estate
located at this address.

   j. 1519 Thompson Avenue, Lehigh Acres, Florida.  On
or about December 7, 2009, defendant Irina Krutoyarsky, issued,
or caused to be issued, a check, totaling approximately
$133 and drawn on the A.P. Account, to the Lee County Tax
Collector, Lee County, Florida for the parcel of land located at
1519 Thompson Avenue, Lehigh Acres, Florida.  Defendant Irina
Krutoyarsky owns or has an interest in a parcel of real estate
located at this address.

   k. 815 Desota Avenue, Lehigh Acres, Florida.  On
or about December 7, 2009, defendant Irina Krutoyarsky, issued,
or caused to be issued, a check, totaling approximately
$149 and drawn on the A.P. Account, to the Lee County Tax
Collector, Lee County, Florida for the parcel of land located at
815 Desota Avenue, Lehigh Acres, Florida.  Defendant Irina
Krutoyarsky owns or has an interest in a parcel of real estate
located at this address.

l.    1214 Williams Avenue, Lehigh Acres, Florida.   On
or about December 7, 2009, defendant Irina Krutoyarsky, issued,
or caused to be issued, a check, totaling approximately
$124 and drawn on the A.P. Account, to the Lee County Tax
Collector, Lee County, Florida for the parcel of land located at
1214 Williams Avenue, Lehigh Acres, Florida.   Defendant Irina
Krutoyarsky owns or has an interest in a parcel of real estate
located at this address.

m.    1112 Poinsettia Avenue, Lehigh Acres, Florida.   On
or about December 1, 2010, defendant Irina Krutoyarsky, issued,
or caused to be issued, a check, totaling approximately
$128 and drawn on the N.L. Account, to the Lee County Tax
Collector, Lee County, Florida for the parcel of land located at
1112 Poinsettia Avenue, Lehigh Acres, Florida.   Defendant Irina
Krutoyarsky owns or has an interest in a parcel of real estate
located at this address.

72.   Between in or around 2006 and in or around 2011,
defendants Irina Krutoyarsky and Paul Mil, and their co-
conspirators, laundered approximately $114,000 through
individuals and bank accounts located on the West Coast.   In
furtherance of this scheme, defendant Irina Krutoyarsky issued
and caused to be issued, HHCH payroll checks to a couple located
in California (hereinafter the "Husband" and the "Wife").
Thereafter, these HHCH checks were deposited into banks, located
in California and Hawaii, maintained by the Husband's and Wife's
daughter (hereinafter the "Daughter").   After these checks were
endorsed by the Daughter, the Daughter issued, and caused to be
issued, personal checks back to defendants Irina Krutoyarsky and
Paul Mil.   For example, on or about March 4, 2010, approximately
32 HHCH payroll checks, each payable to the Husband and each in
the amount of approximately $323.50 (totaling approximately
$10,348), were deposited into one bank account controlled by the
Daughter.   Thereafter, on or about March 27, 2010, the Daughter
issued, and caused to be issued, two personal checks, payable to
defendants Irina Krutoyarsky and Paul Mil, respectively, each
check in the amount of approximately $5,130.   Each respective
check was then deposited into defendant Irina Krutoyarsky's bank
account and defendant Paul Mil's bank account.

69

## The Scheme to Unlawfully Structure Financial Transactions

73.   At all times relevant to this Criminal Complaint, the banks referred to herein were "domestic financial institutions" within the meaning of Title 31, United States Code, Section 5313(a) and Title 31, Code of Federal Regulations, Sections 103.11 and 103.22(a).   Furthermore, Title 31, United States Code, Section 5313(a) and Title 31, Code of Federal Regulations, Section 103.22(a) required each financial institution referred to in this Complaint to file Currency Transaction Reports (hereinafter "CTR") of each deposit, withdrawal, exchange of currency, or other payment and transfer by, through, or to such financial institution that involved a transaction in currency of more than $10,000.

74.   According to records obtained during the investigation, from in or around February 2006 through in or around May 2011, defendant Gulmira Shayakhmetova was listed as the payee on approximately 269 HHCH payroll checks, totaling approximately $296,818.   Furthermore, on numerous twenty-four hour periods between these dates, defendant Gulmira Shayakhmetova cashed multiple HHCH payroll checks, collectively totaling less $10,000 in withdrawals in the twenty-four hour period.

75.   According to records from a bank, on or about January 20, 2010, the following checks were cashed at Bank One, Linden, New Jersey:

| Check Date | Payor | Payee | Approximate Amount |
|---|---|---|---|
| 10/30/09 | HHCH Payroll Account | Gulmira Shayakhmetova | $758 |
| 11/13/09 | HHCH Payroll Account | Gulmira Shayakhmetova | $1,422 |
| 11/27/09 | HHCH Payroll Account | Gulmira Shayakhmetova | $1,422 |
| 12/11/09 | HHCH Payroll Account | Gulmira Shayakhmetova | $595 |

| Check Date | Payor | Payee | Approximate Amount |
|---|---|---|---|
| 12/11/09 | HHCH Payroll Account | Gulmira Shayakhmetova | $1,422 |
| 12/24/09 | HHCH Payroll Account | Gulmira Shayakhmetova | $522 |
| 12/24/09 | HHCH Payroll Account | Gulmira Shayakhmetova | $1,422 |
| 1/8/10 | HHCH Payroll Account | Gulmira Shayakhmetova | $552 |
| 1/8/10 | HHCH Payroll Account | Gulmira Shayakhmetova | 1,397 |
| Total | | | $9,515 |

76.  According to records from a bank, on or about January 21, 2010, the following checks were cashed at three different branches of the same bank (similar to Bank One):

| Check Date | Payor | Payee | Approximate Amount | Bank Branch |
|---|---|---|---|---|
| 7/24/09 | HHCH Payroll Account | Gulmira Shayakhmetova | $1,422 | Howell, NJ (Rt 9, South) |
| 8/7/09 | HHCH Payroll Account | Gulmira Shayakhmetova | $1,422 | Freehold, NJ |
| 8/7/09 | HHCH Payroll Account | Gulmira Shayakhmetova | $1,422 | Freehold, NJ |
| 10/16/09 | HHCH Payroll Account | Gulmira Shayakhmetova | $954 | Manalapan, NJ |
| Total | | | | $5,222 |

77.   According to Cooperating Witness One, on or around late
June 2010, defendant Gulmira Shayakhmetova arrived at HHCH and
met with defendant Irina Krutoyarsky in HHCH's office reception
area.   Cooperating Witness One then observed defendant Irina
Krutoyarsky giving defendant Gulmira Shayakhmetova between
approximately seven and eight HHCH payroll checks that were
payable to defendant Gulmira Shayakhmetova.   Cooperating Witness
One then observed defendant Gulmira Shayakhmetova depart the HHCH
building with the checks in her possession and entering Bank One,
located across the street.   A short time later, Cooperating
Witness One observed defendant Gulmira Shayakhmetova return to
HHCH, meet with defendant Irina Krutoyarsky in her office, and
then hand defendant Irina Krutoyarsky an envelope stuffed with
cash.   Records from Bank One and other financial institutions
reveal the following:

a.   On or about June 22, 2010, the following checks
were cashed at Bank One, Linden, New Jersey:

| Check Date | Payor | Payee | Approximate Amount |
|---|---|---|---|
| 5/14/10 | HHCH Payroll Account | Gulmira Shayakhmetova | $1,414 |
| 5/14/10 | HHCH Payroll Account | Gulmira Shayakhmetova | $1,414 |
| 5/28/10 | HHCH Payroll Account | Gulmira Shayakhmetova | $1,414 |
| 5/28/10 | HHCH Payroll Account | Gulmira Shayakhmetova | $1,414 |
| 6/11/10 | HHCH Payroll Account | Gulmira Shayakhmetova | $1,414 |
| 6/11/10 | HHCH Payroll Account | Gulmira Shayakhmetova | $1,414 |
| Total | | | $8,489 |

78.   According to Cooperating Witness One, on or about
November 16, 2010, defendant Gulmira Shayakhmetova entered the
HHCH office and received several checks payable to defendant

Gulmira Shayakhmetova. Cooperating Witness One then observed
defendant Gulmira Shayakhmetova depart the HHCH building with the
checks in her possession and entering Bank One, located across
the street. A short time later, Cooperating Witness One observed
defendant Gulmira Shayakhmetova return to HHCH, meet with
defendant Irina Krutoyarsky, and then hand defendant Irina
Krutoyarsky a bank envelope stuffed with cash.

        a.    On or about November 16, 2010, the following
checks were cashed at Bank One, Linden, New Jersey:

| Check Date | Payor | Payee | Approximate Amount |
|---|---|---|---|
| 10/1/10 | HHCH Payroll Account | Gulmira Shayakhmetova | $1,414 |
| 10/15/10 | HHCH Payroll Account | Gulmira Shayakhmetova | $1,414 |
| 10/15/10 | HHCH Payroll Account | Gulmira Shayakhmetova | $1,414 |
| 10/29/10 | HHCH Payroll Account | Gulmira Shayakhmetova | $1,414 |
| 11/12/10 | HHCH Payroll Account | Gulmira Shayakhmetova | $1,414 |
| Total | | | $7,074 |

       79.    On or about November 22, 2010, the following
checks were cashed at four different branches of the same bank
(similar to Bank One):

| Check Date | Payor | Payee | Approximate Amount | Bank Branch |
|---|---|---|---|---|
| 9/3/10 | HHCH Payroll Account | Gulmira Shayakhmetova | $1,414 | Freehold, NJ |

| Check Date | Payor | Payee | Approximate Amount | Bank Branch |
|---|---|---|---|---|
| 9/3/10 | HHCH Payroll Account | Gulmira Shayakhmetova | $1,414 | Freehold, NJ |
| 9/17/10 | HHCH Payroll Account | Gulmira Shayakhmetova | $1,414 | Freehold, NJ |
| 9/17/10 | HHCH Payroll Account | Gulmira Shayakhmetova | $1,414 | Howell, NJ (Rt 9, North) |
| 10/1/10 | HHCH Payroll Account | Gulmira Shayakhmetova | $1,414 | Manalapan, NJ |
| 10/29/10 | HHCH Payroll Account | Gulmira Shayakhmetova | $1,414 | Manalapan, NJ |
| 11/12/10 | HHCH Payroll Account | Gulmira Shayakhmetova | $1,414 | Howell, NJ (Rt 9, South) |
| Total | | | | $9,904 |

74

80.   According to records from the New Jersey Department of Labor, defendant Gulmira Shayakhmetova has reported wages from HHCH for the years 2007 through 2011.   In addition, according to these same records, in 2010 and 2011, defendant Gulmira Shayakhmetova has received wages from two other entities, totaling collectively $54,973 (2010) and $69,575 (2011).   Your Affiant submits that these entities are defendant Gulmira Shayakhmetova's true employers.

81.   Based on the above, Your Affiant submits that defendant Gulmira Shayakhmetova is not a true employee of HHCH; rather, she receives HHCH checks from defendant Irina Krutoyarsky, payable to defendant Gulmira Shayakhmetova, and then cashes these checks at Bank One and other banks.   Virtually all of these checks are in amounts under $10,000, and the transactions are conduced in a manner to evade the banks' obligation to file CTRs, as required under federal law.   Furthermore, Your Affiant submits that on at least two occasions, after cashing the HHCH checks, defendant Gulmira Shayakhmetova gave portions of the money back to defendant Irina Krutoyarsky.

## FIRST FORFEITURE ALLEGATIONS

1.   The allegations contained in paragraphs 1 through 81 of this Criminal Complaint are incorporated by reference as though set forth in full herein for the purpose of noticing forfeitures pursuant Title 18, United States Code, Section 982(a)(7).

2.   The United States hereby gives notice to the defendants that, upon conviction of the offenses charged in the Criminal Complaint, the government will seek forfeiture, in accordance with Title 18, United States Code, Section 982(a)(7), any and all property, real and personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, including but not limited to the following:

a.   At least $3.45 million, a sum of money representing the amount of proceeds obtained as a result of the offense, for which the defendants are jointly and severally liable;

b.   All of defendant Irina Krutoyarsky's right, title, and interest, including all appurtenances and improvements thereon, in the real property located at 23680 Walden Center Drive, #108, Bonita Springs, Florida;

c.   All of defendant Irina Krutoyarsky's right, title, and interest, including all appurtenances and improvements thereon, in the real property located at 23540 Walden Center Drive,, #210, Bonita Springs, Florida;

d.   All of defendant Irina Krutoyarsky's right, title, and interest, including all appurtenances and improvements thereon, in the real property located at 220 South Riverwalk Drive, Palm Coast, Florida;

e.   All of defendant Irina Krutoyarsky's right, title, and interest, including all appurtenances and improvements thereon, in the real property located at 89 Island Estates Parkway, Palm Coast, Florida;

76

f.   All of defendant Irina Krutoyarsky's right, title, and interest, including all appurtenances and improvements thereon, in the real property located at 128 Hidden Palms Drive, 3-102, Ponte Vedra Beach, Florida;

g.   All of defendant Irina Krutoyarsky's right, title, and interest, including all appurtenances and improvements thereon, in the real property located at 106 Central Park South, Unit 14C, New York, New York;

h.   All of defendant Irina Krutoyarsky's right, title, and interest, including all appurtenances and improvements thereon, in the real property located at 10 Outlook Way, Springfield, New Jersey;

i.   All of defendant Irina Krutoyarsky's right, title, and interest, including all appurtenances and improvements thereon, in the real property located at 503 & 505 Richmond Avenue, Lehigh Acres, Florida;

j.   All of defendant Irina Krutoyarsky's right, title, and interest, including all appurtenances and improvements thereon, in the real property located at 1323 Maple Avenue North, Lehigh Acres, Florida;

k.   All of defendant Irina Krutoyarsky's right, title, and interest, including all appurtenances and improvements thereon, in the real property located at 1519 Thompson Avenue, Lehigh Acres, Florida;

l.   All of defendant Irina Krutoyarsky's right, title, and interest, including all appurtenances and improvements thereon, in the real property located at 815 Desota Avenue, Lehigh Acres, Florida;

    m. All of defendant Irina Krutoyarsky's right, title, and interest, including all appurtenances and improvements thereon, in the real property located at 1214 Williams Avenue, Lehigh Acres, Florida; and

    n. All of defendant Irina Krutoyarsky's right, title, and interest, including all appurtenances and improvements thereon, in the real property located at 1112 Poinsettia Avenue, Lehigh Acres, Florida.

  3. If by any act or omission of the defendants, any of the property subject to forfeiture described in Paragraph 2 herein:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party,

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be subdivided without difficulty,

it is the intent of the United States of America, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 982, to seek forfeiture of any other property of the defendants up to the value of the property described above in Paragraph 2.